2024 PA Super 201

| | | |
|---|---|---|
| IN RE: ADOPTION OF C.P.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.P.D., FATHER | : | No. 719 EDA 2024 |

Appeal from the Decree Entered February 21, 2024
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): 2021-A0015

| | | |
|---|---|---|
| IN RE: ADOPTION OF C.P.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.J.D. AND G.O. | : | No. 720 EDA 2024 |

Appeal from the Decree Entered February 21, 2024
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): 2021-A0015

| | | |
|---|---|---|
| IN RE: ADOPTION OF C.P.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: ADOPTIONS FROM THE HEART | : | No. 792 EDA 2024 |

Appeal from the Decree Entered February 21, 2024
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): 2021-A0015

J-S23016-24

BEFORE: STABILE, J., KING, J., and COLINS, J.[*]

OPINION BY KING, J.:                    **FILED SEPTEMBER 6, 2024**

In these consolidated cross-appeals, Appellant, T.P.D. ("Father"), appeals at docket No. 719 EDA 2024 from the decree involuntarily terminating his parental rights to his son, C.P.D. ("Child") (born in September 2020), based on the respective termination petitions filed by Adoptions from the Heart ("AFTH") and Child's court-appointed legal counsel/guardian *ad litem* ("GAL"), and joined by the pre-adoptive parents, A.J.D. and G.O. ("Pre-Adoptive Parents"). Additionally, at dockets Nos. 720 EDA 2024 and 792 EDA 2024, Pre-Adoptive Parents and AFTH filed cross-appeals from the court's earlier orders that denied confirmation of J.S. ("Mother")[1] and Father's consents to adoption and denied reconsideration of same. For the following reasons, we affirm the involuntary termination of Father's parental rights, but we vacate the orders denying confirmation of Mother and Father's consents to adoption.

The relevant facts and procedural history of this case are as follows. Child was born in September 2020. Mother and Father had prior negative experiences with Children and Youth Services ("CYS"). Fearful of CYS involvement concerning Child, Mother and Father placed Child with relatives

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother voluntarily relinquished her parental rights to Child on February 28, 2023, and she is not a party to this appeal.

- 2 -

who had custody of their two older daughters, A.A.D. and A.J.D.[2]  On October 11, 2020, Mother contacted AFTH regarding placement for Child, as Mother and Father were having disagreements with the relatives caring for their daughters because they had been denying Mother and Father contact with the children.  In late October 2020, Mother and Father conferred with two caseworkers from AFTH, Jackie Lovell and Michaelina Bendig.  On October 23, 2020, Ms. Lovell had a phone conversation with Mother, during which they discussed the open adoption process and the availability of a Post Adoption Contact Agreement ("PACA").

The next day, Mother and Father met with Ms. Bendig.  Ms. Bendig indicated that AFTH would support them in seeking a PACA with respect to their younger daughter, whose adoption had not yet been finalized. Additionally, in response to their concerns, and to extinguish any potential for CYS involvement, Ms. Bendig suggested Mother and Father consider transferring custody of Child to AFTH.  Mother and Father signed the forms transferring custody to AFTH that same day.  After Mother and Father executed the transfer documents, they made an appointment to meet with Ms. Bendig and Pre-Adoptive Parents, whom they had selected, at the offices of AFTH on October 27, 2020.

On October 27, 2020, Mother and Father went to the AFTH office in Wynnewood, Pennsylvania.  Mother and Father met Pre-Adoptive Parents at

_____

[2] This family had already adopted Mother and Father's oldest daughter and were in the process of adopting their younger daughter.

that time. Additionally, Mother and Father signed consents to adoption, as well as a PACA concerning Child, which Pre-Adoptive Parents also signed. During this meeting, Ms. Bendig reiterated that she would help Mother and Father obtain a PACA concerning their younger daughter. Additionally, Ms. Bendig offered assistance to Mother and Father regarding a needed car battery and cell phone minutes.

On October 28, 2020, Mother and Father again returned to the AFTH office, where they spent some time with Child, who had been brought there by a temporary guardian. On this day, Pre-Adoptive Parents took physical custody of Child, and Child has remained with them ever since.

On Saturday, November 21, 2020, Father called AFTH's evening answering service, and left a message that he wished to revoke his consent to adoption. Father left his cell phone number for a return call. The next day, Ms. Bendig called and texted Father, offering to discuss his desire to revoke his consent. Nevertheless, Father did not return Ms. Bendig's call that day. In response to her text, Father stated that he could not talk at the moment but Mother or Father would call her back. Ms. Bendig texted Father that he needed to call her and not the on-call answering service. However, Father did not return Ms. Bendig's phone call. Ms. Bendig did not write a letter formally advising Father that a revocation of his consent must be in writing. Ms. Bendig also did not remind Father of this requirement in her text messages.

On November 22 and 23, 2020, Ms. Bendig e-mailed Mother and Father at an e-mail address they both used regarding whether they wanted to revoke

their consents to adoption. Father did not respond to the e-mail. Mother replied that she did not want to revoke her consent. Ms. Bendig did not receive any communication from Father between November 22, 2020 and December 30, 2020 indicating that Father still wanted to revoke his consent.

AFTH filed petitions to confirm the consents of adoption by Mother and Father on February 18, 2021.

> [The c]ourt scheduled a hearing on the Petitions to Confirm the Consents to Adoption on May 4, 2021, at which [Mother and Father] appeared, but were not represented by counsel. [Mother and Father] alleged that they were under duress while signing their consents and expressed a desire to revoke their consents. Following [Mother and Father's] request for the appointment of counsel, this [c]ourt adjourned the hearing on the Petitions to Confirm Consents, [and appointed counsel for Mother and Father.]
>
> On June 22, 2021, this [c]ourt held a hearing at which … Father and … Mother, now both represented by counsel, indicated that they had consented to the adoption. However, … Father maintained that he had validly and timely revoked his consent. He also maintained that, although he had agreed to a voluntary [PACA] with [Pre-Adoptive Parents] that provided for an exchange of photographs and letters and also three visits per year between [Mother and Father], [Pre-Adoptive Parents], and [Child], he also wanted to negotiate a PACA pursuant to which [Child] would continue to have visits with his daughters, A.A.D. and A.J.D. … Father testified that a PACA fostering visits between [Child] and his birth sisters had never been meaningfully explored. To permit consideration of whether a PACA was in the interests of each of the children, this [c]ourt appointed a GAL for Child and for [Child's birth sisters]. In light of Father's revocation claim, and despite his articulated desire to proceed with the hearing …, the [c]ourt was constrained to schedule two additional hearings on the, now contested, Petitions to Confirm Consent for October 18, 2021 and October 25,

2021.

> A third hearing was scheduled, as expediently as feasible, for January 6, 2022. At the conclusion of testimony, counsel asserted the following legal issues: 1) whether the consents were voluntary, intelligent, and knowing where [Mother and Father] alleged that they were conditioned on execution of a PACA (and a promise of a second PACA related to one of their daughters), 2) whether [Mother and Father] attempted to and, in fact, did revoke their consents in writing; 3) whether AFTH's advice and documents were confusing and misleading as to the sufficiency of a verbal telephone call to revoke consent; and 4) whether AFTH compounded the confusion surrounding revocation of consents by failing to remind [Mother and Father] that revocation must be in writing, and exacerbated [Mother and Father's] sense of duress and intimidation by advising them that AFTH would make a report to the office of [CYS] if they revoked their consents.

(Orphans' Court Opinion, 5/13/22, at 2-3) (internal footnotes omitted).

On May 13, 2022, the Orphans' Court decided that Mother and Father's consents to adoption were invalid. Regarding the attempted revocation of Mother and Father's consents, the court explained that they failed to deliver a written revocation of consent within 30 days following the execution of their consents, and they failed to challenge the validity of the consents within 60 days, as required under the statute. (***Id.*** at 22). The court expressly found Father's testimony concerning a purported written revocation incredible. (***See id.*** at 22-24).[3] Nevertheless, the court found their consents to adoption were

_____

[3] Notwithstanding these findings, the court was "troubled" by certain actions of AFTH where AFTH provided Mother and Father a document describing procedures for revocation which did not specify that revocation must be written. Rather, the document stated that a birth parent who wished to revoke

*(Footnote Continued Next Page)*

conditioned on an agreement for a PACA, and that a consent to adoption conditioned on a PACA is not a voluntary, intelligent, and unconditional consent, rendering the consents invalid. (*Id.* at 19).

On May 21, 2022, AFTH filed a motion for reconsideration, which the court granted. Following additional briefing, the court entered an order on September 23, 2022 denying the motion for reconsideration on the merits and resting on the court's May 13, 2022 decision.

While the petitions to confirm consents were pending, AFTH filed a petition to involuntarily terminate Father's parental rights on September 2, 2021, and a petition to involuntarily terminate Mother's parental rights on September 23, 2021. Child's GAL also filed a petition for involuntarily termination of Mother and Father's parental rights on September 21, 2021. The court had deferred scheduling an involuntary termination hearing pending disposition of the petitions to confirm consents.

On October 11, 2022, Pre-Adoptive Parents filed a notice of appeal from the court's May 13, 2022 decision. AFTH also appealed this decision on October 12, 2022. Nevertheless, this Court quashed those appeals on December 9, 2022, based on the pendency of the petitions for involuntary

_____

a consent must call the caseworker. Additionally, the record indicated that Ms. Bendig advised Mother and Father to call her, but she did not communicate to them that a revocation must be in writing. Ms. Bendig also informed Mother that if they wanted to revoke consent, she would have to notify CYS that they reclaimed custody of Child. Given Mother and Father's expressed fear that CYS would become involved, the court found that this statement had the effect of intimidating Mother from expressing her honest views about whether she wanted to revoke consent. (*Id.* at 24-25).

termination of Mother and Father's parental rights.

As previously stated, Mother voluntarily relinquished her parental rights to Child on February 27, 2023. On May 18, 2023 and May 22, 2023, the Orphans' Court conducted hearings regarding the petitions for involuntary termination of Father's parental rights. The court summarized the testimony at the termination hearings as follows:

> At the outset of the hearing on the contested Petitions for Involuntary Termination of … Father's parental rights, all counsel stipulated that the [c]ourt may consider all of the testimony and evidence, including the testimony and evidence taken in the prior proceedings with respect to the Petitions to Confirm Consents to adoption.
>
> On May 22, 2023, this [c]ourt heard testimony of Dr. Erica Williams, and admitted in evidence her evaluations of … Father and her Supplemental Report as Exhibits P-7 and P-11. Dr. Williams was qualified as an expert in psychology, forensic psychology, and bonding and attachment assessments and capacity evaluations.
>
> Dr. Williams performed a parenting capacity evaluation of … Father on March 31, 2023, which was admitted in evidence as Exhibit P-7. Dr. Williams testified that it was difficult to obtain a chronological timeline or history from … Father, as he "had an inability or unwillingness to provide the information as needed and to provide it in a structured, consistent way." Dr. Williams identified several areas of concern, including a longstanding history of criminal legal issues, as well as substance abuse issues, and … Father's inability to accept responsibility for this criminal record history. According to Dr. Williams, … Father, rather than being accountable for his own actions, tends to indicate that these things happened to him and see himself as the victim. Dr. Williams also identified chronic instability in … Father's housing, issues of domestic violence, and significant employment instability. He described to Dr. Williams that he was currently employed, but moving to a new job, but

"couldn't really explain what the new job was." His testimony in [c]ourt was similar, in that he would mention having expectations of a new and better job, and at first indicate it was a certainty, but when pressed[, he would] mention two or three job possibilities that were uncertain, or for which he had had an interview. Dr. Williams explained that in trying to evaluate … Father's circumstances and identify solutions, he presents with "pervasive minimization, … denial, [and] defensiveness." These traits were confirmed by administration of the Minnesota Multiphasic Personality Inventory, according to Dr. Williams.

When Dr. Williams asked … Father whether he anticipated any concerns about parenting [Child], or about removing him from the home that he has known for more than two years, … Father stated that he did not have any concerns about parenting and that he did not foresee any issues. She concluded that this attitude was further evidence of … Father's pattern of "denial, minimization, the inability to see the actual reality of what may or may not happen." Dr. Williams testified that, when asked about removing [Child] from the home where he has been residing for more than two years, initially … Father "denied that there would be any impact on [Child]. Then he thought about it and thought perhaps there would be impact, but it will only take a matter of days for [Child] to get over it and then it would be a nonissue.... Again, it's the denial and the minimization and not understanding of the impact of real life events on others, and it's concerning that he couldn't predict and then plan for the support that [Child] would need given that severe disruption of attachment." Dr. Williams also testified, based upon her expertise, that when a child has a secure attachment for a period of years, if you abruptly change that, it is going to be a severe disruption.

Dr. Williams also testified that … Father expressed that his goal with respect to this case involving his son, [Child], was initially to obtain custody of [Child], but then to turn over the child to his family members who have adopted his two older daughters.

Dr. Williams also observed patterns in … Father's criminal history and his decades-long substance abuse history of placing himself and others at risk of harm, including by his

substance abuse, and when he became violent with a police officer, and incidents of domestic violence. Ultimately, Dr. Williams testified that it was her opinion, to a reasonable degree of psychological certainty, based upon her evaluation, that … Father lacked the capacity to parent, and also that he has not begun the process of remedying these incapacities.

Dr. Williams also testified that she performed an assessment of whether there was a parental bond between … Father and [Child], which included observing them together, and expressed her opinion that there is no parent-caregiver bond between the two.

On examination by his own counsel, … Father acknowledged that he had changed his mind multiple times about his goal for these proceedings. Initially, when counsel was first appointed for him, he supported the Petition to Confirm his consent to the adoption, but desired to negotiate for more visits under a [PACA]. At the hearing on the Petitions to Confirm Consent, he took the position that he had revoked his consent. At one time he advised Dr. Williams and others that he intended to obtain custody of [Child] but then to turn custody over to the family members who have adopted [Child's siblings]. Still later, at trial on these petitions, he changed his position again, asserting that he wished to obtain custody of [Child] and raise him himself.

… Father acknowledged that he had received from his counsel the requests for discovery, as well as this [c]ourt's Order for him to provide discovery, but that although he wished to comply, he had never dropped off any pay stubs, tax returns, lease, documentation regarding his substance use treatment or any other documentation to his counsel to be delivered to opposing counsel before trial. Having not produced these exhibits before trial as required, … Father did bring with him to [c]ourt a tax return for 2022, some pay stubs, and a lease, as well as, a document demonstrating the support he is receiving towards his housing through a program called HUD-VASH in Chester County, Pennsylvania. These documents were admitted in evidence as Exhibits F-1, F-2, F-3, F-4, and F-5.

Questions were raised about whether … Father had ever filed

a custody petition in the Family Division of this Court, during the pendency of these proceedings. Although his [c]ourt-appointed counsel helped to draft a petition for him to file to seek custody, he testified that he took it to the Prothonotary intending to file it, but that he neither paid the filing fee, nor filed a petition for leave to file without paying the fee (I.F.P.). As a result, no petition for custody was ever filed.

Regarding … Father's housing, counsel for the child established through cross-examination that … Father lived in an apartment … in Paoli, Pennsylvania, at the time of [Child's] birth, and from approximately 2018 to 2021. He acknowledged that he received several eviction notices while living at that address but protested that he was not evicted. After leaving that apartment in 2021, he lived for a time in a Holiday Inn Express hotel, and then … in Paoli, at a home owned by someone he worked for. Sometime around July of 2022, he testified that he entered a program through the VA for Homeless Veterans, called Fresh Start, and moved into housing at the VA in Coatesville, Pennsylvania. Although he acknowledged being admitted to this program he was argumentative and evasive with counsel and appeared to resist acknowledging that this was a program for homeless veterans. [The GAL] offered in evidence as Exhibit P-12, a letter from the VA dated April 24, 2023, confirming that … Father participated in a program of supportive housing for homeless veterans called Fresh Start, and lived there from July of 2022 through November 28, of 2022. At the end of November 2022, he moved to a two-bedroom cottage … in West Chester, Pennsylvania, with support from the HUD-VASH program.

On cross-examination of … Father, counsel for the child established that … Father had a criminal record stretching back at least to 2006 in Pennsylvania. Criminal records of … Father were admitted in evidence as Exhibits P-3(a), P-3(b), P-3-(c), P-3(d), P-3(e) and P-3(f).

Asked about his substance abuse history, … Father acknowledged a history of being addicted to Percocet. At first he testified that his addiction began in 2011 or 2012, but then he acknowledged that he was in a drug rehab in 2005 or 2006. Although his ability to clearly testify to the

dates was limited, he acknowledged being released from jail to a program called "Minsec" in 2005 or 2006, being released from jail to a program in Valley Forge, Pennsylvania, in 2009, and attending a third rehab called Mirmont in 2019, after his release from incarceration. He also acknowledged that after the first rehab stay in 2005, or 2006, he was prescribed Suboxone.

… Father's testimony in [c]ourt on May 18, and May 22, 2023, consistent with the description by Dr. Erica Williams, evidenced a pattern of minimization, denial and defensiveness, particularly with respect to his criminal record, his substance abuse history, and his housing instability. His failure to provide documents, in response to a discovery request and in response to a [c]ourt Order, prior to trial on these subjects exacerbated the problem with corroborating his claims to have achieved employment and housing stability and sobriety.

… Father acknowledged that he has not provided any financial support for [Child], nor sent him any cards or gifts, except when having a visit with him, during the entire period from October of 2020 until the hearing in May 2023.

… Father has had approximately 5 visits with the child … between October 2020 and through the date of the hearings in May 2023. According to the testimony of [the pre-adoptive father G.O.], he attempted to but could not reach … Father for much of 2022. Indeed, a visit was scheduled for … Father with [Child] in the summer of 2022, but … Father did not show. Although … Father stated that he wished to have visits and contact with [Child], he typically did not make a request to set up a visit on a specific date. His attorney on some occasions was involved in assisting him to set up visits. The most recent visit between … Father and [Child] occurred [in] January of 2023, and was set up on the initiative of the [P]re-[A]doptive [P]arents, although … Father's attorney had initially made a request for a visit in December near Christmas.

(Orphans' Court Opinion, 7/14/23, at 3-8) (internal citations omitted).

At the conclusion of the termination hearing on May 22, 2023, the

Orphans' Court granted the petitions for involuntary termination of Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1), (a)(2), and (b).

Father timely appealed the termination decree, and AFTH and Pre-Adoptive Parents subsequently filed cross-appeals challenging the earlier orders denying confirmation of the adoption consents and reconsideration of same. On January 4, 2024, however, this Court vacated the May 22, 2023 order terminating Father's parental rights, and remanded with instructions for the Orphans' Court to expressly determine whether Child's GAL had a conflict of interest that prevented her from also serving as Child's legal counsel in the termination proceedings. This Court dismissed the cross-appeals without prejudice. *See In re Adoption of C.P.D.*, 1586 EDA 2023 (Pa.Super. filed Jan. 4, 2024) (unpublished memorandum).

On February 21, 2024, the Orphans' Court expressly determined that no conflict of interest existed that prevented Child's GAL from also serving as Child's legal counsel in the termination proceedings. Consequently, the Orphans' Court re-entered the decree involuntarily terminating Father's parental rights to Child. Father timely filed a notice of appeal on February 29, 2024, along with a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(a)(2)(i). Pre-Adoptive Parents and AFTH also timely filed cross-appeals and respective Rule 1925(a)(2)(i) statements.

Father raises the following issues for our review:

> Whether there is sufficient evidence to support the findings of this Honorable Court that Petitioners proved by clear and convincing evidence the requirements of 23 Pa.C.S. [§]

- 13 -

2511(a)(1) for the involuntary termination of Birth Father's parental rights?

Whether there is sufficient evidence to support the findings of this Honorable Court that Petitioners proved by clear and convincing evidence the requirements of 23 Pa.C.S. [§] 2511(a)(2) for the involuntary termination of Birth Father's parental rights?

Whether this Honorable Court abused its discretion in finding that the developmental, physical and emotional needs and welfare of [Child] will be best served by the termination of Birth Father's parental rights pursuant to 23 Pa.C.S. [§] 2511(b), when there is a strong and loving bond between Birth Father and the child, and severance of that bond will cause irreparable harm to the child?

(Father's Brief at 4).

Pre-Adoptive Parents raise the following issue for our review:

Whether the [Orphans' C]ourt committed an error of law by denying to confirm the consent to adoption of [Father], after deciding that the consent was in compliance with 23 Pa.C.S. § 2711(a) and (d), and that he did not timely revoke his consent or file a petition alleging fraud or duress in accordance with 23 Pa.C.S. § 2711(c)?

(Pre-Adoptive Parents' Brief at 11).

AFTH raises the following issues for our review:

Whether the [Orphans' C]ourt committed an error of law by denying confirmation [of] Father's consent to adoption, after finding that: (a) the consent complied with 23 Pa.C.S. § 2711(a) and (d); (b) Father did not timely revoke his consent in accordance with § 2711(c)(1)(i); and (c) Father did not timely challenge the validity of the consent on the basis of fraud or duress in accordance with … 23 Pa.C.S. [§] 2711(c)(3).

Whether the [Orphans' C]ourt's decision to invalidate consents signed by the Birthparents many months earlier was manifestly unreasonable because it was contrary to the

weight of [the] evidence.

(AFTH's Brief at 13).

In his issues combined, Father disputes the Orphans' Court's finding that he refused or failed to perform parental duties concerning Child. Father emphasizes that at the outset of this case, he brought Child into the care of AFTH for placement for an open adoption. Father argues that there was no indication of abuse or neglect, nor was there a question of Father's capacity to care for Child. At the time of Child's placement, AFTH had Mother and Father sign consents to adoption and a PACA and made other promises to Mother and Father. Father insists that Mother and Father revoked their consent for adoption within 30 days. Father asserts that AFTH took no action to return Child to Mother and Father, effectively ignoring their revocation. Father submits that he had no counsel, had revoked his consent, and had no idea how to secure Child's return.

Father maintains that once AFTH filed for the adoption and confirmation of consents, that opened the door for Father to assert his revocation. Father contends that AFTH took no steps to set up visits between Father and Child while the matter concerning the validity of the adoption consents was pending. Father highlights that the court deemed his consent to adoption invalid on May 13, 2022. Father avers that he has never refused to perform parental duties. Father stresses that he has acted appropriately with Child during visits and attended to Child's needs when he had the opportunity. Under these

circumstances, Father submits that termination of his parental rights was improper under Section 2511(a)(1).

Additionally, Father argues that no incapacity existed when Child was placed with AFTH. Father asserts that he initially planned for an open adoption, and there was no removal of Child from the home due to any incapacity, abuse, or neglect by Father. To the contrary, Father emphasizes that he was trying to assure Child would have the proper care and control by meeting with and selecting Pre-Adoptive Parents. Father claims that he has been employed and maintained housing throughout this litigation. Thus, Father challenges any "claims and innuendos that Father was incapable of caring for his son both physically and financially." (Father's Brief at 15). Father insists that he has shown during visits that he can attend to Child's needs appropriately. Father avers that the lack of his "future plan" should not be held against him, as a parent does not have to have a future plan to have children. (*Id.* at 16). Under these circumstances, Father submits that termination of his parental rights was also improper under Section 2511(a)(2).

With respect to Section 2511(b), Father reiterates that he revoked his consent to adoption within 30 days. Father argues that AFTH and Pre-Adoptive Parents should have returned Child to Father at that time. "Instead they have held this child, requiring Father to go through extended court hearings and the passing of valuable time in the life of a child so young." (*Id.* at 17). Father maintains that the court did not invalidate Father's consent to

adoption until May 2022; at that point, Child had been with Pre-Adoptive Parents for 18 of his 20 months of life. Father complains that he did not have a chance to develop a significant bond with Child during this time. Father stresses that the "delay in time from the revocation [of the consent to adoption] to present was caused by [AFTH's] failure to properly address the revocation of the consent in this case and created a situation whereby the child, rather than be returned to the parents in less than 30 days, has now been in the custody of the [Pre-Adoptive Parents] for in excess of 20 months." (*Id.* at 18). Father proclaims that neither he nor Child should be penalized in such a harsh fashion due to AFTH's inaction. Father concludes the court erred by involuntarily terminating his parental rights, and this Court must grant relief. We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

- 17 -

*In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

The court granted involuntary termination of Father's parental rights to Child on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a)    General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." **In re Z.P., supra** at 1117. When conducting a termination analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of…his parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under

the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.  In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties.  Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child **or fails to perform parental duties.**

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted) (emphasis added).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties.  *In re Z.P., supra* at 1117.  "Parents are required to make diligent efforts towards the

reasonably prompt assumption of full parental responsibilities." *Id.* at 1117-18. Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

Further, our Supreme Court has recently clarified that, in making a Section 2511(b) determination, a trial court must analyze: (1) whether the

- 21 -

parental bond is "necessary and beneficial to the child;" (2) "the child's need for permanency and length of time in foster care;" (3) "whether the child is in a pre-adoptive home and bonded with foster parents;" and (4) "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety and stability." *Interest of K.T.*, ___ Pa. ___, ___, 296 A.3d 1085, 1113 (2023). Moreover, the Court explained that, when reviewing the nature of the parental bond, a court must consider "whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* Importantly, the *K.T.* Court's decision is particularly relevant to an analysis of an existing parental-bond. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

Instantly, at the conclusion of the termination hearings, the court discussed Father's history of unstable employment, unstable housing, unstable relationships, criminal conduct, substance abuse, and "inadequate self-knowledge about each of these things that would enable him to prevent continuation of these unfortunate interactions, inadequate recognition of his own responsibility for the criminal activities, excessive focus on himself as a victim of [CYS]…" (N.T. Termination Hearing, 5/22/23, at 113-14). Based

upon this history, Dr. Williams opined to a reasonable degree of psychological certainty that at the present time, Father lacks the capacity to parent Child. (*Id.* at 113).

Further, the court noted that Father minimized any concern for Child that would arise from removing him from Pre-Adoptive Parents' home, indicating a lack of ability to appreciate the reasonably foreseeable consequences to Child. (*Id.* at 116). The court also highlighted that Father did not ever send Child cards, gifts, letters, or provide financial support for Child. (*Id.* at 117). Although Father stated that he opened a bank account for Child, the account was in Father's name and was not restricted in any form or designated for the benefit of Child. (*Id.*) The court emphasized that Father sought visits with Child and negotiated a voluntary PACA that provided for visits, as well as letters and e-mails. Nevertheless, Father did not consistently seek visitation with Child and visited with him only five times in total. (*Id.* at 117). Although Pre-Adoptive Parents set up an e-mail account to share pictures and updates about Child, Father did not make use of that account or communicate via that account to receive updates. (*Id.* at 118).

Under these circumstances, the court concluded that Father failed to perform any parental duties for a period of more than six months prior to the filing of the termination petitions, and Father is not capable of performing parental duties and taking care of Child. (*Id.* at 121-22). Thus, the court found termination was proper under Section 2511(a)(1) and (2). (*Id.* at 122).

(**See also** Orphans' Court Opinion, 7/14/23, at 8-9) (finding that "Father has failed and refused to perform parenting responsibilities, and has an incapacity to parent. These findings are supported by the lengthy record and the expert testimony of Dr. Erica Williams").

Our review of the record supports the court's analysis under Section 2511(a)(1).[4] As the Orphans' Court noted, Father has not provided for Child financially, sent Child cards or gifts, kept apprised of updates concerning Child via the e-mail account specifically set up for that purpose, or consistently visited with Child. Rather, the record confirms that Pre-Adoptive Parents perform all parental duties. Although Father claims AFTH did not set up visits for Father and that litigation concerning the validity of the adoption consents delayed Father's reunification with Child, Father fails to articulate what steps **he** took to care for Child during the pendency of litigation. Indeed, the evidence shows that Father did not file a custody petition following his purported revocation of his adoption consent even though his counsel had drafted one, did not request visits, and did not seek updates on Child's well-being during this time. Additionally, Dr. Williams made clear that terminating Father's parental rights would not cause irreparable harm to Child. Thus, the record supports the court's decision that for at least six months prior to the filing of the termination petitions, Father failed to perform parental duties for

---

[4] We need only discuss one subsection of Section 2511(a), along with Section 2511(b). **See In re Z.P., supra**.

Child.  *See* 23 Pa.C.S.A. § 2511(a)(1); *In re Z.S.W., supra*.

Regarding Section 2511(b), the court explained:

> In this case the [c]ourt finds that there is no parental bond between the child, … and … Father.  … Father has not provided for the child emotionally or financially, has not acted in a parental role with the child, and has attended only approximately 5 visits with the child in over two-and-a-half years.  Based upon his own testimony, and the extensive record, as well as the expert testimony of Dr. Erica Williams, this [c]ourt concludes that there is no parental bond between [Child] and … Father and that termination of … Father's parental rights will not cause irreparable harm to the child.
>
> The child is placed in a loving and nurturing home where all of his needs are being met, and he is bonded to [Pre-Adoptive Parents].  In addition to their own testimony, this is supported in the expert testimony of Dr. Erica Williams. Indeed, … Father's inability to appreciate the profound disruption and harm that would occur for [Child] were he to be removed from this loving home is one of many indicators of … Father's incapacity to appreciate and anticipate the needs and welfare of the child, and to place the child's welfare ahead of his own desires, demonstrates his incapacity to parent.

(Orphans' Court Opinion, 7/14/23, at 9).  The record supports the court's analysis concerning Section 2511(b).  *See In re Z.P., supra*.  Further, the court's analysis confirms the court considered all relevant factors regarding whether a bond exists between Father and Child.  *See Interest of K.T., supra*.  On this record, we see no error of law or abuse of discretion concerning the court's termination of Father's parental rights under Section 2511(a)(1) and (b).  *See In re Z.P., supra*.

Thus, we turn to the cross-appeals.[5]  For purposes of disposition, we consider the arguments of Pre-Adoptive Parents and AFTH together.  Pre-Adoptive Parents argue that both Mother and Father executed consents to Child's adoption on October 27, 2020 that complied with 23 Pa.C.S.A. § 2711(a) and (d).  Pre-Adoptive Parents assert that neither Mother nor Father delivered to AFTH a written revocation of those consents at any time.  Pre-Adoptive Parents contend that neither parent filed a petition to revoke the

_____

[5] We observe that by affirming the trial court's decision to involuntarily terminate Father's parental rights, and in light of Mother's voluntary relinquishment of her parental rights, the issues raised by Pre-Adoptive Parents and AFTH appear to be moot.  *See In re D.A.*, 801 A.2d 614, 616 (Pa.Super. 2002) (*en banc*) (explaining general rule that actual case or controversy must exist at all stages of judicial process or case will be dismissed as moot; issue before court is moot if in ruling upon issue, court cannot enter order that has any legal force or effect).  Although no party expressly raises an exception to the mootness doctrine, AFTH notes that the Orphans' Court's decision to invalidate Father's adoption consent has the potential to impact permanency for other children.  Specifically, AFTH maintains that "[i]f the [Orphans' C]ourt's reasoning in this case remains on the docket undisturbed, it will endure as a viable roadmap for other birthparents to use to challenge their consents, long after statutory deadlines have passed and bonds have attached between the child and their adopting parent."  (AFTH's Brief at 16-17).  AFTH acknowledges that although the record in this case is not available for public view, any of the lawyers involved in this case are familiar with the decision and could use it when representing clients in other adoption cases.  (*Id.* at 17 n.5).  AFTH insists that the court's ruling "would turn Pennsylvania adoption practice on its head, undermining the legislature's clear and unequivocal intent to provide certainty and permanency for children."  (*Id.* at 17).  Thus, even if the issues raised in the cross-appeals are moot, we decline to dismiss the cross-appeals and proceed to address the merits of those issues.  *See In re D.A., supra* (explaining that we will decide questions otherwise rendered moot when case involves question of great public importance; question presented is capable of repetition and apt to elude appellate review; or party to controversy will suffer some detriment due to decision of trial court).

consents based upon fraud or duress during the 60-day period required under 23 Pa.C.S.A. § 2711(c). Pre-Adoptive Parents emphasize the Orphans' Court's finding that the testimony of Mother and Father was not entirely credible concerning the circumstances surrounding their consents. Nevertheless, the Orphans' Court found the consents to adoption invalid because they were not voluntary and unconditional in light of AFTH's promises of a PACA with respect to Child. Because Mother and Father did not revoke their consents to adoption in a timely manner, however, Pre-Adoptive Parents contend that the Orphans' Court was precluded from addressing the issue of the validity of their consents. Pre-Adoptive Parents submit that the Orphans' Court relied on cases involving voluntary relinquishment of parental rights rather than cases concerning consents to adoption under Section 2711.

In AFTH's issues combined, AFTH echoes the same arguments advanced by Pre-Adoptive Parents. Additionally, AFTH argues that by ruling that the signing of a PACA was a basis to invalidate the adoption consents, the court effectively nullified another Pennsylvania statute, 23 Pa.C.S.A. §§ 2731-2742 ("Act 101").[6] AFTH asserts that the Orphans' Court essentially ruled that using

_____

[6] Chapter 27, Subchapter D of the Adoption Act, commonly referred to as "Act 101" sets forth the procedures related to PACAs at Sections 2731-2742:

> The purpose of this subchapter is to provide an option for adoptive parents and birth relatives to enter into a voluntary agreement for ongoing communication or contact that:

*(Footnote Continued Next Page)*

the statutory tool created for court-enforceable future contact canceled out the adoption consent, which is the opposite of Act 101's purpose. AFTH maintains that the purpose of Act 101 is to give birthparents the assurance of knowing if, when, and how often they will see their child in the future if they choose voluntary adoption. Thus, AFTH maintains that Act 101 was intended to be used in conjunction with the adoption consent and not as a separate "transaction" as the Orphans' Court suggested. AFTH insists that the court's "reliance on the absence of an express statement in Act 101 that a consent cannot be conditional upon a PACA is misplaced where the legislative history shows that PACA and voluntary consent are fundamentally connected."

_____

(1) is in the best interest of the child;

(2) recognizes the parties' interests and desires for ongoing communication or contact;

(3) is appropriate given the role of the parties in the child's life; and

(4) is subject to approval by the courts.

23 Pa.C.S.A. § 2731. Section 2732 defines a PACA (called an "Agreement" under the statute) as a "voluntary written agreement between an adoptive parent and a birth relative that is approved by a court and provides for continuing contact or communication between the child and the birth relative or between the adoptive parent and the birth relative as provided under this subchapter." 23 Pa.C.S.A. § 2732. The PACA must be filed with the court that finalizes the adoption of the child. **See** 23 Pa.C.S.A. § 2735(a). Further, the court shall approve the PACA if it has been entered into knowingly and voluntarily by all parties, and is in the best interest of the child. **See** 23 Pa.C.S.A. § 2735(b). The PACA shall not be legally enforceable unless approved by the court, which the court shall approve when the statutory conditions are satisfied. **See** 23 Pa.C.S.A. § 2735(b), (c).

(AFTH's Brief at 49). AFTH submits that the Orphans' Court's decision creates an impossible dilemma for adoption agencies who must counsel clients about the opportunity to sign a PACA as part of their adoption options. Under the court's rationale, AFTH posits that professionals will need to advise birthparents of Act 101 and then ask them to forsake the opportunity to sign a PACA at the time of signing consent and only later try to get the parties to sign one.

Further, AFTH avers that any suggestion that it misled or induced Father to signing the adoption consent is contrary to the overwhelming weight of the evidence. AFTH emphasizes testimony from Ms. Bendig, who affirmed that she did not make promises to deliver benefits unrelated to Child's adoption or that Father could have believed his consent was conditioned on any such promises. Although AFTH acknowledges that it tried to help Father with some problems such as securing funds to help Father replace his car battery, AFTH insists that its offer to help could not have reasonably been perceived as an inducement to encourage Father to sign the adoption consent. AFTH also contends that it did not promise to get a PACA for Father's daughter if Father signed the adoption consent for Child. AFTH highlights that Father was familiar with the adoption and revocation process because he went through it a year before these proceedings for his daughter. As well, AFTH points to Mother's testimony confirming that she signed her adoption consent because she did not want Child to be placed in the foster care system, and not in

reliance on having a PACA or any promise from AFTH. Pre-Adoptive Parents and AFTH conclude that the court erred in refusing to confirm the consents to adoption, and this Court must grant relief. We agree with AFTH and Pre-Adoptive Parents' position.

At the outset, we note:

> The aim of statutory interpretation is to give effect to the intent of our General Assembly. The plain language of a statute is the best indicator of the General Assembly's intent, and only where the language is not clear and free from ambiguity do we turn to principles of statutory construction to aid our interpretation. When interpreting a statute, we must always read the words of a statute in context, not in isolation, and give meaning to each and every provision and our interpretation must not render any provision extraneous.... We must presume that the General Assembly did not intend a result that is absurd or unreasonable or which violates the Constitutions of the United States or this Commonwealth, and that it intend for the entire statute to be effective and certain.

*In re J.W.B.*, 659 Pa. 561, 577-78, 232 A.3d 689, 698-99 (2020) (internal citations and quotation marks omitted).

Section 2504 of the Adoption Act describes the procedure whereby a parent executes a consent to adoption, and an agency or adoptive parent files a petition to confirm that consent:

> **§ 2504. Alternative procedure for relinquishment**
>
> **(a)    Petition to confirm consent to adoption.—**If the parent or parents of the child have executed consents to an adoption, upon petition by the intermediary or, where there is no intermediary, by the adoptive parent, the court shall hold a hearing for the purpose of confirming a consent to an adoption upon expiration of the time periods under section 2711 (relating to consents necessary to adoption).

The original consent or consents to the adoption shall be attached to the petition.

**(b)**     **Hearing.**—Upon presentation of a petition filed pursuant to this section, the court shall fix a time for a hearing which shall not be less than ten days after filing of the petition.  Notice of the hearing shall be by personal service or by registered mail or by such other means as the court may require upon the consenter and shall be in the form provided in section 2513(b) (relating to hearing). Notice of the hearing shall be given to the other parent or parents, to the putative father whose parental rights could be terminated pursuant to subsection (c) and to the parents or guardian of a consenting parent who has not reached 18 years of age.  The notice shall state that the consenting parent's or putative father's rights may be terminated as a result of the hearing.  After hearing, which shall be private, the court may enter a decree of termination of parental rights in the case of a relinquishment to an adult or a decree of termination of parental rights and duties, including the obligation of support, in the case of a relinquishment to an agency.

23 Pa.C.S.A. § 2504(a) and (b).

Further, Section 2711 of the Adoption Act governs the content, form, and validity of consents necessary for an adoption.  *See* 23 Pa.C.S.A. § 2711. Regarding the validity and revocation of a consent for adoption, the statute provides:

### § 2711.  Consents necessary to adoption

\*     \*     \*

**(c) Validity of consent.**—No consent shall be valid if it was executed prior to or within 72 hours after the birth of the child.  A putative father may execute a consent at any time after receiving notice of the expected or actual birth of the child.  Any consent given outside this Commonwealth shall be valid for purposes of this section if it was given in accordance with the laws of the jurisdiction where it was

executed. A consent to an adoption may only be revoked as set forth in this subsection. The revocation of a consent shall be in writing and shall be served upon the agency or adult to whom the child was relinquished. The following apply:

(1) Except as otherwise provided in paragraph (3):

(i) For a consent to an adoption executed by a birth father or a putative father, the consent is irrevocable more than 30 days after the birth of the child or the execution of the consent, whichever occurs later.

(ii) For a consent to an adoption executed by a birth mother, the consent is irrevocable more than 30 days after the execution of the consent.

(2) An individual may not waive the revocation period under paragraph (1).

(3) Notwithstanding paragraph (1), the following apply:

(i) An individual who executed a consent to an adoption may challenge the validity of the consent only by filing a petition alleging fraud or duress within the earlier of the following time frames:

(A) Sixty days after the birth of the child or the execution of the consent, whichever occurs later.

(B) Thirty days after the entry of the adoption decree.

(ii) A consent to an adoption may be invalidated only if the alleged fraud or duress under subparagraph (i) is proven by:

(A) a preponderance of the evidence in the case of consent by a person 21 years of age or younger; or

(B) clear and convincing evidence in all other cases.

23 Pa.C.S.A. § 2711(c). "[T]his Section describes the timeline for revocation of a consent to adoption, as well as a challenge to its validity (and only on the grounds of fraud or duress). This Section further makes clear that a revocation and/or a challenge to the validity of a consent to adoption must be in conformity with the Act." *In re Adoption of J.A.S.*, 939 A.2d 403, 407-08 (Pa.Super. 2007), *appeal denied*, 598 Pa. 750, 954 A.2d 577 (2008) (internal citations omitted).

In *In re Adoption of J.A.S.*, the birth mother revoked her consent to adoption 100 days after she had authorized an amended consent. The Orphans' Court determined that birth mother's consent to adoption was void *ab initio*, because it had originally omitted information required under Section 2711(d) (detailing content of consent to adoption).[7] "Essentially, the court

_____

[7] Section 2711(d) provides in full:

**(d) Contents of consent.**—

(1) The consent of a parent of an adoptee under 18 years of age shall set forth the name, age and marital status of the parent, the relationship of the consenter to the child, the name of the other parent or parents of the child and the following:

I hereby voluntarily and unconditionally consent to the adoption of the above named child.

I understand that by signing this consent I indicate my intent to permanently give up all rights to this child.

I understand such child will be placed for adoption.

*(Footnote Continued Next Page)*

_____

I understand I may revoke this consent to permanently give up all rights to this child by placing the revocation in writing and serving it upon the agency or adult to whom the child was relinquished.

If I am the birth father or putative father of the child, I understand that this consent to an adoption is irrevocable unless I revoke it within 30 days after either the birth of the child or my execution of the consent, whichever occurs later, by delivering a written revocation to (insert the name and address of the agency coordinating the adoption) or (insert the name and address of an attorney who represents the individual relinquishing parental rights or prospective adoptive parent of the child) or (insert the court of the county in which the voluntary relinquishment form was or will be filed).

If I am the birth mother of the child, I understand that this consent to an adoption is irrevocable unless I revoke it within 30 days after executing it by delivering a written revocation to (insert the name and address of the agency coordinating the adoption) or (insert the name and address of an attorney who represents the individual relinquishing parental rights or prospective adoptive parent of the child) or (insert the court of the county in which the voluntary relinquishment form was or will be filed).

I have read and understand the above and I am signing it as a free and voluntary act.

(2) The consent shall include the date and place of its execution and names and addresses and signatures of at least two persons who witnessed its execution and their relationship to the consenter. The consent of an incarcerated parent of an adoptee may be witnessed by a correctional facility employee designated by the correctional facility. Any consent witnessed by a correctional facility employee shall list the address of the correctional facility on the consent.

*(Footnote Continued Next Page)*

concluded a 'valid' consent to adoption was a necessary predicate under the statute before the timeliness provisions for revoking and/or challenging the validity of the consent were triggered." *Id.* at 408.

On appeal, this Court reversed, explaining:

> The statute does not explicitly state it is subject to strict construction; but it does plainly provide for time constraints to revoke and/or challenge the validity of a consent to adoption. The practical consequence of the court's interpretation effectively permitted Birth mother to challenge the validity of her consent to adoption at any time, based upon the existence of a technical omission in the form of the initial consent. This lack of finality is exactly the mischief the legislature intended to remedy with the revision to Section 2711 of the Adoption Act in 2004, the purpose of which was to afford finality to the adoption process.[1] Hence the statute renders a consent to adoption irrevocable more than thirty (30) days after execution. *See* 23 Pa.C.S.A. § 2711(c)(1)(ii).[2] Additionally, the statute precludes a challenge to the validity of the consent to adoption after sixty (60) days following the birth of the child or the execution of the consent, whichever occurs later, and only upon the grounds of fraud or duress. *See* 23 Pa.C.S.A. § 2711(c)(3)(i)(A). Thus, the unambiguous language of the statute required the Orphans' [C]ourt in this case to consider the timeliness of Birth mother's petition to revoke and/or challenge the validity of her consent before it considered the merits of her claim. **Contrary to the court's interpretation, the threshold act that triggers these provisions of Section 2711 is the timely filing of the petition to revoke and/or challenge the validity of the consent to adoption. Whether Birth mother's consent to adoption was valid could be addressed only if her petition had been timely filed. Essentially, the untimeliness of Birth mother's petition precluded**

---

(3) In lieu of two witnesses a consent may be acknowledged before a notary public.

23 Pa.C.S.A. § 2711(d).

**the court from addressing the issue of validity.**

> [1] The legislature rewrote subsection (c), effective May 24, 2004, which applies to all adoption proceedings initiated after that date.
>
> [2] Nothing in the statute presupposes the "validity" of the consent.
>
> Here, Birth mother signed a consent to adoption on April 12, 2006. She signed an amendment on July 12, 2006. Assuming without deciding the later date triggered the statutory time limits, Birth mother's petition was still out of time with respect to both her attempt to revoke her consent and her attempt to challenge its validity. The Orphans' [C]ourt erred when it reached the validity issue first, found the "form" of the consent flawed, and refused to address the timeliness requirement, under the guise of strict construction. We hold Section 2711 required the court first to review the timeliness of Birth mother's petition before addressing whether the consent to adoption technically conformed to the statute. Accordingly, we reverse the court's order overruling Appellant's preliminary objections to Birth mother's petition to revoke and/or challenge the validity of her consent to adoption and remand for further proceedings.

*In re Adoption of J.A.S., supra* at 408-09 (emphasis added). *See also In re R.I.*, 172 A.3d 665, 667-68 (Pa.Super. 2017) (vacating order which dismissed father's petition for voluntary relinquishment of parental rights and consent to adoption based on father's verbal revocation of consent made 72 days after he executed consent to adoption; father's oral revocation of his consent to adoption that occurred more than 30 days after his execution of petition for voluntary relinquishment did not meet requirements of Section 2711(c) and court erred in considering its merits).

In *In re J.W.B., supra*, the father told the mother of his children that

he wanted to terminate his parental rights and that the mother's husband could adopt them. The father executed the consent document and returned it to their attorney. Nevertheless, the father later told the attorney that he changed his mind and no longer consented to the adoption. The mother and the father subsequently obtained separate counsel, and the mother filed a petition to confirm the father's consent to adoption. The father opposed the petition, claiming that his consent was invalid because it did not meet the requirements of Colorado law (where the father was residing) for a consent to adoption. The court held a hearing, at which time the father conceded that although he verbally had informed the attorney that he wanted to revoke his consent to the adoption, he never reduced his revocation to writing. The father also presented testimony from a Colorado attorney, who testified that the consent the father had executed would not be valid and enforceable under Colorado law, because Colorado law imposes requirements for a consent to adoption that are not required by Pennsylvania law. The Colorado attorney further testified that Colorado law provides that consents to adoption may be revoked at any time prior to the adoption.

At oral argument, the father suggested that because the consent was invalid under Colorado law, it could not be deemed valid under Pennsylvania law, and he was not required to comply with the timing requirements under Section 2711(c) governing the revocation of consent. The mother relied on *In re Adoption of J.A.S., supra*, to support her argument that the filing of

a timely revocation petition triggers an inquiry into the validity of a consent, and the father's failure to file a timely revocation precluded his challenge to the validity of his consent. Ultimately, the Orphans' Court agreed with the mother's position and found that the father's failure to timely revoke his consent or challenge the validity of his consent barred his challenge to the validity of his consent.

The father appealed, and this Court affirmed, relying on its prior decision in *In re Adoption of J.A.S.* The Supreme Court subsequently granted allowance of appeal. Our High Court disagreed with the Orphans' Court and this Court's analyses, explaining:

> The Superior Court's ruling that the merits of Father's arguments regarding the validity of his consent could not be considered because he failed to comply with the timing requirements in Section 2711(c) ignores the timing requirement in Section 2504(a), which provides that a hearing on a petition to confirm consent cannot take place until after the expiration of the time periods under Section 2711—thirty days for revocation and sixty days for a validity challenge based on fraud or duress. Despite the requirement that the court must confirm consent at a hearing **after** the expiration of these time frames, the Superior Court effectively concluded that a relinquishing parent could not be heard at the Section 2504(a) hearing. Under the Superior Court's interpretation, there is no opportunity to challenge, or the court to confirm, **that the previously executed consent complied with the technical requirements to effectuate a legally sufficient consent, including those set forth in Sections 2711(c) and (d)** or in the adoption laws of another state. Here, Father has not attempted to revoke his prior consent and he has not alleged that his prior consent was the result of fraud or duress. Instead, Father contends that his execution of the consent document prepared by Attorney Wiest did not constitute a legally valid

consent under Colorado law and was therefore void *ab initio*, thereby precluding any need to revoke or otherwise challenge it. In other words, there was no consent to adoption. The Superior Court's conclusion that there is no opportunity to raise this challenge does not comport with the Adoption Act.

Although the exclusivity language in Subsection 2711(c)(3) suggests that challenges to the validity of a previously executed consent are limited to those timely filed and based upon fraud or duress, thereby precluding a challenge to the sufficiency of the consent, we decline to so interpret the statutory framework of the Adoption Act. Because it is our obligation to give meaning to all provisions of the statute, we must read the time frames in Section 2711(c)(3) in harmony with Section 2504(a), which provides a different time frame for the court to confirm a consent to adoption.

In conducting statutory interpretative analysis, the General Assembly has instructed that courts must presume that it did not intend a result that violates the Constitutions of the United States or this Commonwealth. Termination of parental rights implicates due process rights under the Fourteenth Amendment to the United States Constitution. Parents have a fundamental liberty interest in the care, custody, and management of their children, and before those rights are terminated the person must be given due process of law. On at least two occasions, this Court has held that due process requires that the grounds for termination of parental rights must be established by clear and convincing evidence. As such, consistent with the demands of due process, a parent must be provided with an opportunity to raise a challenge to the fact of consent, in accordance with applicable law, to the termination of his parental rights before the entry of a decree of adoption.

The Adoption Act expressly provides a forum to raise such a challenge. Section 2504(a) of the Adoption Act provides that if a parent or parents of a child have executed consents to an adoption, the adoption intermediary or the adoptive parent shall file a petition requesting that the trial court hold a hearing "for the purpose of confirming a consent to an adoption." 23 Pa.C.S. § 2504(a). The hearing may not take place until after the thirty and sixty day time periods in

Section 2711 have expired. *Id.* The consent or consents to be confirmed must be attached to the petition. *Id.* The parties must be provided with notice of the hearing by personal service or registered mail, and the notice must advise the consenting parent that his or her parental rights may be terminated as a result of the hearing. 23 Pa.C.S. § 2504(b).

Section 2504(a) is entitled "Petition to confirm consent to adoption," and as this title makes clear, it requires the trial court to confirm the validity of consent(s) to an adoption. While the statute requires that the hearing may not be held until after the expiration of the time limits in Section 2711, it does not indicate that the trial court's function at the hearing is limited to confirming that those time limits have passed. If the trial court's task was so perfunctory, no hearing would be necessary because a certification would suffice. Instead, the consent(s) at issue must be attached to the petition, **and the obvious import of this requirement is that the trial court must review the consents and consider any and all arguments raised by the parties challenging their conformity with the Adoption Act**. For instance, Section 2711(c) includes timing requirements (no consent is valid if executed within seventy-two hours after the birth of the child, although a putative father may consent at any time after receiving notice of the expected or actual birth), and Section 2711(d) includes an exhaustive list of the information that must be included in the consent document. In this regard, if Father's hypothetical text message: "I'm tired of the little monsters, you can have them" was advanced in a petition to confirm consent, it could be challenged at the Section 2504(a) hearing for lack of conformity to the statute's requirements. **Such a challenge goes to compliance with the statutory mandates for a valid consent, which are designed to assure the relinquishing parent's understanding of the nature of the proceedings and the consequences. The specific provisions of Section 2711, including in particular the time limitations for revocation or a validity challenge based upon fraud or duress, are premised on the execution of a consent that complies with the legislature's statutory requirements. Otherwise, there is nothing to invalidate**.

While the Superior Court should not have disregarded Father's challenge to the validity of his consent on timeliness grounds, we take no issue with that court's determination that Father has not presented any grounds for relief in this appeal. …

\* \* \*

[A] consent executed outside of Pennsylvania will be deemed to be valid in a Pennsylvania adoption proceeding if it complies with the consent requirements set forth in **either** Sections 2711(c) and (d) or the Adoption Act **or** the laws of the state which the consenting parent resides at the time of the execution of the consent. Pennsylvania's validity requirements do not yield to those of the state in which the consenting parent resides; instead the laws of both states provide alternative means to effectuate a valid consent to terminate parental rights and permit an adoption in accordance with Pennsylvania's Adoption Act.

For these reasons, we must reject Father's argument that the Superior Court was required to consider whether his consent was valid pursuant to Colorado law. Father does not contest that the consent that he executed complied in all respects with Pennsylvania's validity requirements, including the inclusion of the necessary understandings and acknowledgments set forth in Section 2711(d) of the Adoption Act. Because the consent that Father executed is valid under Pennsylvania law, it is immaterial whether it is also valid under Colorado law.

*In re J.W.B., supra* at 578-83, 232 A.3d at 699-702 (some citations and quotation marks omitted; some emphasis added; internal footnote omitted).

In *In re C.P.R.*, No. 726 MDA 2021, 2021 WL 5314743 (Pa.Super. filed Nov. 16, 2021) (unpublished memorandum),[8] the mother appealed from the

---

[8] *See* Pa.R.A.P. 126(b) (explaining that we may rely on unpublished decisions of this Court filed after May 1, 2019 for their persuasive value).

trial court's decree confirming her consent to adoption. The mother argued that her consent was invalid as it was signed pursuant to an *ex parte* communication with opposing counsel when she was represented by her own counsel. The mother further maintained that if she knew she had representation at that time, she would have sought counsel's advice before deciding to sign the consent. The mother further testified that she believed that by signing the documentation she would still be able to see her child. The trial court decided that it could not reach the merits of the mother's challenge to her consent because the challenge was untimely. Even if she could establish fraud or duress, the trial court noted that she was foreclosed from raising such claims by the statutory time limits.

On appeal, this Court agreed with the trial court. In doing so, this Court noted that the mother did not file a *praecipe* with respect to revocation of consent until six months after initially executing her consent and almost two months after the maternal grandparents had filed to confirm said consent. "This was beyond the statutory limits at which time [the m]other's consent was irrevocable." **Id.** at *8. **See also Interest of A.H.**, Nos. 266 MDA 2021, 267 MDA 2021, 268 MDA 2021 (Pa.Super. filed Aug. 13, 2021) (unpublished memorandum) (holding mother's attempt to revoke consent to adoption was untimely under Section 2711 where mother filed petition to revoke 98 days after signing consent; noting that mother's reliance on **In re J.W.B.** afforded no relief; **In re J.W.B.** was distinguishable because father in that case argued

that execution of consent document did not constitute legally valid consent and was void *ab initio*; thus, issue in that case did not involve revocation of consent, but whether there was legal consent at all).

Instantly, the Orphans' Court explained:

> Although … Father testified that he attempted to revoke his consent in writing, and attempted to deliver a written revocation to the offices of AFTH, and was prevented from delivering it, after extensive consideration of the conflicting testimony, this [c]ourt determined that [Mother and Father] did not establish that they had revoked these consents in a writing delivered to AFTH within the 30 day period following the execution of the consents on October 27, 2020.
>
> \* \* \*
>
> As noted in this [c]ourt's prior Opinion, dated May 13, 2022, … Father's account of when and to whom he attempted to deliver a written revocation of his consent changed significantly each time he recounted it and was contradicted by the testimony of witnesses who had been employed by AFTH and who could document that they were not present at the offices on the dates he testified that he saw them and spoke to them about his revocation.

(Supplemental Orphans' Court Opinion, 11/30/22, at 6-8). As well, the Orphans' Court conceded that Mother and Father "did not file a petition challenging the validity of their consents within 60 days following the execution of the consents, alleging fraud or duress in accordance with 23 Pa.C.S. [§] 2711(c)." **Id.**

Notwithstanding its findings regarding Mother and Father's failure to comply with the procedures outlined in Section 2711(c), the Orphans' Court relied on **In re J.W.B., supra** to hold that Mother and Father were still

permitted to challenge the validity of their consents to adoption. (***See id.*** at 9). The Orphans' Court opined:

> Pursuant to [***In re J.W.B., supra***], this [c]ourt properly held a hearing as required under [S]ection 2504(b) of the statute, and properly provided an opportunity for [Mother and Father] to be heard with respect to their assertions that their consents, when signed on October 27, 2020, were invalid and void *ab initio*.

(***Id.*** at 10).

In deciding that Mother and Father's consents were invalid, the Orphans' Court reasoned:

> In this case, [Mother and Father] understood that they were promised a PACA with respect to [Child] and this enforceable agreement was a condition of their decision to sign their consents to the adoption of [Child]. Both Ms. Lovell and Ms. Bendig also understood that a PACA was so important to [Mother and Father] that it had to be prepared to be signed on the same date as the consents to adoption. In this case, the promise of a PACA with respect to [Child] was met; however, the fact that this promise was met does not mean that the consents to adoption were unconditional.
>
> To compound the concerns in this case, [Mother and Father] also both had an understanding that AFTH was committed to assisting them in obtaining a PACA with respect to their younger daughter. This was also a promise, and although she tried to distinguish this as unrelated to the adoption of [Child], Ms. Bendig acknowledged that this was important to [Mother and Father] and that she had made a promise to them to help them obtain this other PACA. This promise was not met.
>
> In light of these promises to [Mother and Father], which [they] considered to be essential, the consents signed on October 27, 2020 by [Mother and Father] were not unconditional and therefore are not valid and cannot be confirmed.

- 44 -

(Orphans' Court Opinion, 5/13/22, at 19-20).[9]

For the following reasons, we cannot agree with the Orphans' Court's analysis. As this Court has stated, Section 2711 "makes clear that a revocation and/or a challenge to the validity of a consent to adoption must be in conformity with the Act." ***In re Adoption of J.A.S., supra***. Indeed, the statute renders a consent to adoption **irrevocable** more than 30 days after its execution. ***See*** 23 Pa.C.S.A. § 2711(c)(1)(ii). Further, the statute precludes a challenge to the validity of the consent (which may be based only on grounds of fraud or duress) after 60 days following the execution of the consent. ***See*** 23 Pa.C.S.A. § 2711(c)(3)(i)(A). This statutory language is clear and unambiguous. ***See In re J.W.B., supra***. As this Court has previously held, "the threshold act that triggers these provisions of Section 2711 is the timely filing of the petition to revoke and/or challenge the validity of the consent to adoption. Whether [Mother or Father's] consent to adoption was valid could be addressed only if [a] petition had been timely filed. Essentially, the untimeliness of [a revocation] petition precluded the court from addressing the issue of validity." ***In re Adoption of J.A.S., supra*** at

_____

[9] In so holding, the Orphans' Court relied on two cases involving a voluntary relinquishment of parental rights wherein this Court stated that the parent's purported voluntary relinquishment of parental rights was not intelligent or voluntary where it was conditioned on the promise or belief of a PACA with the child. ***See In re Adoption of A.W.***, 230 A.3d 1139 (Pa.Super. 2020) and ***In re C.M.C.***, 140 A.3d 699 (Pa.Super. 2016), which we discuss in greater detail ***infra***.

409. Thus, this Court has consistently declined to address a challenge to the validity of a consent to adoption where the proffered revocation of consent was not timely filed in compliance with the statute. ***See id. See also In re R.I., supra***; ***In re C.P.R., supra***; ***Interest of A.H., supra***.

Although we recognize the Orphans' Court's reliance on ***In re J.W.B., supra***, we disagree with the court's interpretation of our Supreme Court's pronouncements therein. We reiterate that the Supreme Court clarified that at a hearing to confirm a consent to adoption, "the trial court must review the consents and consider any and all arguments raised by the parties challenging their conformity with the Adoption Act." ***In re J.W.B., supra*** at 580-81, 232 A.3d at 700. The Supreme Court went on to state that "[t]he specific provisions of Section 2711, including in particular the time limitations for revocation or a validity challenge based upon fraud or duress, are premised on the execution of a consent **that complies with the legislature's statutory requirements**." ***Id.*** at 581, 232 A.3d at 701 (emphasis added). Thus, our Supreme Court held in ***In re J.W.B.***, that at the hearing to confirm the adoption consent, the Orphans' Court must consider whether the consent complies with the statutory framework delineated in Section 2711.

Here, the record makes clear that neither Father nor Mother revoked their consent to adoption **in writing** within 30 days, or alleged fraud or duress within 60 days, of execution of their consents. ***See*** 23 Pa.C.S.A. § 2711(c)(1), (3). Further, there is no dispute that the consents complied with the statutory

mandates of Section 2711, including the contents of the consents. *See* 23 Pa.C.S.A. § 2711(d). *See also In re J.W.B., supra*. Therefore, Mother and Father's belated attempt to revoke their consents to adoption was time-barred under the statute, and the court could not consider challenges to the validity of the consents that were not based on non-conformity with the statute. *See id.* We agree with Pre-Adoptive Parents that "if [Mother or Father] felt that [they were] under duress to sign the consent due to a fraudulent misrepresentation of securing a PACA, [they] had to file a petition to revoke the consent challenging the validity of the consent within sixty (60) days of its execution."[10] (Pre-Adoptive Parents' Brief at 40-41). Based upon the

_____

[10] Moreover, we disagree that Mother and Father's consents were necessarily invalid based on promises of a PACA concerning Child and Mother and Father's younger daughter. *In re C.M.C.* and *In re Adoption of A.W.* (the cases on which the Orphans' Court relied) are distinguishable from the case at bar because the cases governing voluntary relinquishment implicate different statutes than Section 2711 which could be relevant to a PACA.

Notably, the Adoption Act provides two alternative procedures for voluntary relinquishment of parental rights: (1) by the parent filing a petition to relinquish parental rights under Sections 2501 (relinquishment to agency) or 2502 (relinquishment to adult intending to adopt child); or (2) by the adoptive parent filing a petition to confirm a birth parent's consent to adoption under Section 2504—the procedure which took place in this case. Under Sections 2501 and 2502, "the natural parent first files a petition in the trial court seeking permission to permanently relinquish his or her parental rights to the minor child. The Adoption Act[, per Section 2503,] requires the trial court to hold a hearing, and for the relinquishing parent to ratify his or her consent to termination, no less than ten days after the petition is filed." *In re C.M.C., supra* at 708-09. The comment to Section 2503(a) explains that "[t]he petitioner's in-court ratification of consent assures due process requirements
*(Footnote Continued Next Page)*

foregoing, we disagree with the Orphans' Court's denial of the petitions to confirm Mother and Father's consents to adoption. Accordingly, we affirm the involuntary termination of Father's parental rights, but we vacate the orders denying confirmation of Mother and Father's consents to adoption.

Decrees affirmed in part; vacated in part. Jurisdiction is relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/6/2024

---

in view of the finality of the termination decree as to the parent." *Id.* at 709 (citing 23 Pa.C.S.A. § 2503(a), *Comment*).

As discussed in *In re C.M.C.*, the principal holding of this Court was that the mother's voluntary relinquishment of parental rights was invalid because the court failed to comply with the statutory procedures mandated in voluntary relinquishment cases. Specifically, the court did not provide the mother with the requisite ten-day notice period so that she could consider her choice before ratifying that decision. Conversely, in this case, the parties proceeded under Section 2711 of the Adoption Act, which permits the parent 30 days to revoke a consent to adoption for any reason, and 60 days to file a petition to revoke based on fraud or duress. Thus, a voluntary relinquishment of parental rights filed under Section 2501 or 2502 that is conditioned on a PACA may constitute an invalid relinquishment where the petitioner would be deprived of an ability to revoke the relinquishment based on non-fulfillment of the PACA. Under Section 2711, however, the same concerns are not necessarily present because the petitioner would have 30 or 60 days to revoke the adoption consent if the agreed-upon PACA did not come to fruition.