J-S06003-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.E.M.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1256 WDA 2024 |

Appeal from the Order Entered August 2, 2024
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): 018-2024

BEFORE: PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:         **FILED: March 13, 2025**

Mother appeals from the August 2, 2024, order entered in the Westmoreland County Court of Common Pleas granting the petition of the Westmoreland County Children's Bureau ("WCCB") and involuntarily terminating Mother's parental rights to her minor child, A.E.M.A. ("Child") (d.o.b. April 2015).[1] After our careful review, we affirm.

The WCCB initially became aware of this family in February 2021, from a referral alleging Mother and Father (collectively, "Parents") were using illegal drugs and that the home was in poor condition. Child had not seen a pediatrician in 2 years and was not current on vaccines. The WCCB

---

[1] The court also involuntarily terminated the parental rights of S.G.A. ("Father"). He is not a party to this appeal.

recommended Child be taken to a pediatrician and scheduled for a forensic interview and closed the case.

The WCCB received a second referral in November 2021. The referral alleged the home was in disarray, Mother continued her drug use, and Child was unkempt and often hungry. Child still had not been seen by a pediatrician and, contrary to Mother's claim, Child was not enrolled in cyber school. Child did not have a usable bedroom and Parents were in the process of being evicted from the home. Mother was unemployed. The WCCB contracted for Mother's drug screening and nonoffenders' treatment, as Father was an indicated perpetrator of sexual assault of a minor in another case.[2] Mother refused to comply with drug screens and was unresponsive and unavailable to both the WCCB and service providers. Mother refused to schedule a forensic interview for Child.

The WCCB filed a dependency petition on February 9, 2022, and the court declared Child dependent after a March 11, 2022 adjudication and disposition hearing. The court transferred legal custody of Child to the WCCB

_____

[2] Father was indicated as a perpetrator of sexual abuse of a minor on November 28, 2021, in another dependency matter. Father did not appeal his indicated status. As a result, at all times during the pendency of this case, Father was ordered to attend offender's treatment, which he completely failed to do.

- 2 -

and placed Child in a foster home.[3] The court found the WCCB had made reasonable efforts to prevent Child's removal from the home and that return to Mother's care was contrary to Child's best interests. The court voiced its concern about Mother's ability to protect Child from potential abuse by Father. Testimony established the poor condition of Mother's home, Mother's non-compliance with relapse and nonoffender's treatment, and Mother's lack of cooperation with clinicians at The Children's Institute, which supervised the visits between Mother and Child. The court ordered Mother to (1) undergo a drug and alcohol evaluation and comply with treatment recommendations; (2) comply with random drug screens; (3) participate in and successfully complete sexual abuse nonoffender treatment; (4) obtain/maintain stable and appropriate housing; and (5) obtain/maintain verifiable legal employment.

The court held 4 permanency review hearings between June 22, 2022, and February 6, 2024. At the hearings, the court found Child's placement continued to be necessary, Mother vacillated between minimal to moderate compliance with the permanency plan, and between no progress and moderate progress in alleviating the circumstances that led to Child's removal.

Specifically, in June, 2022, the orphans' court found Mother had had no contact with the WCCB, had complied with one of 13 drug screens, attended

---

[3] Child was initially placed in a traditional foster home. Approximately 3 months' later, on June 24, 2022, she was placed with her maternal uncle, R.S. ("Foster Father"), and his wife (collectively, "Foster Parents" or "Foster Family"), where she continued to reside at the time of the termination hearing.

only 2 of 9 nonoffender therapy sessions, and failed to provide information about drug and alcohol treatment. Mother attended only 12 of 40 supervised visits with Child, to which she often was late. Although Mother claimed she and Father had separated, Parents visited Child together, obtained housing together, and Father was supporting Mother financially. The WCCB voiced its concern about Mother's denial of Father's abuse of another child despite Father's indicated status.

At the December 5, 2022 permanency review hearing, the court credited Mother with moderate compliance with the permanency plan and in alleviating the circumstances that led to Child's placement. Mother reported attending drug and alcohol treatment, although she failed to obtain the ordered evaluation. Mother only had complied with 3 of 19 drug screens during the relevant period, and all were positive for marijuana. Mother was unable to provide any documentation to support her claim that she had obtained housing and employment. Mother completed nonoffenders treatment and represented she and Father remained separated. With the exception of Mother's cooperation with nonoffenders treatment, Mother's court ordered services remained the same. Visitation with Child was changed to one unsupervised visit per week, contingent on Mother's cooperation with drug screens. The unsupervised visits began in December 2022. However, visitation reverted to supervised in May 2023 because, for the period of December 2022 through

May 2023, Mother only complied with 11 drug screens out of 93 and she tested positive for methamphetamines twice.

On June 26, 2023, the court found Mother's compliance with the permanency plan remained moderate. However, her compliance with drug testing was poor. Despite reporting that she was participating in drug and alcohol treatment, Mother had not provided proof or signed an information release. Although Mother stated she and Father were still separated, he continued to use her address as his own. Concerns about Mother's drug use continued to present a barrier for unsupervised contact with Child. Mother refused to test at the June 26th hearing although screeners were present. The court ordered Mother to continue and successfully complete recommended drug and alcohol treatment, comply with random drug screens, and obtain and maintain appropriate housing and employment.

The December 13, 2023, hearing was continued. The WCCB had requested reports from service providers for this hearing and received a report from The Children's Institute. According to the report, Mother attended 17 of 21 scheduled visits between June 29, 2023, and November 30, 2023. Communication between Child and Mother during meals had decreased, with Child watching television instead of interacting with Mother. Mother advised The Children's Institute provider she would not use the entire visit to help Child with schoolwork and she refused to take accountability for Child's removal, instead blaming the WCCB for not being reunified with Child.

On February 6, 2024, WCCB filed a petition for the involuntary termination of Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(2), (a)(8), and (b). The court held a contested termination hearing on June 20, 2024 and July 18, 2024. The WCCB presented the testimony of clinical psychologist Dr. Neil Rosenblum; Jean DeFilippis, owner of ARC Point Labs; Foster Father; Tiffany Mazary, visitation supervisor; Tara Lorenzo, caseworker for the WCCB; and Dr. Richelle O'Malley. Mother elected not to testify on her own behalf.

Dr. Rosenblum testified that Parents were scheduled for evaluations and a bonding study on November 9, 2023, but they failed to attend. *See* N.T., 6/20/24, at 8. The Doctor stated Mother missed the appointment due to illness, and that his office called Mother twice to reschedule, but Mother never returned the phone calls. Dr. Rosenblum testified about Child's psychological evaluation and an interactional assessment performed with Child and foster parents. *See id.* at 8-15. The doctor explained that, based on his assessment, Child still exhibited insecurities and anxieties about social interactions because Mother had isolated Child when she was in Mother's care. For example, Mother failed to register Child for school, so Child did not begin school until she was in foster care at 7 years' old. He also testified the Foster Parents worked diligently to provide Child with optimal support and individual attention to overcome deficits that were present when Child entered their care in 2022. *See* N.T., 6/20/24, at 7-13. According to Doctor Rosenblum, Child identified

Foster Family as her own family since she had resided in their home for 1 ½ years. The doctor stated Foster Parents provided outstanding care and attention to Child's developmental and social/emotional needs. *See id.* at 19. Based on his assessment, the doctor believed it was important for the court to decide Child's permanency as soon as possible to provide her with permanency and stability. *See id.* at 20.

Jean DeFilippis of ARC Point Labs testified about Mother's drug screenings over the life of the case, beginning on December 10, 2021. According to Ms. DeFilippis, Mother complied with only 25 of the 226 screening attempts. Mother tested positive for marijuana, methamphetamines and fentanyl on numerous occasions. After August 2, 2023, Mother failed to comply with any drug screens and on one occasion she attempted to use urine that was not hers. *See id.* at 28-31. Other times, Mother's urine was not valid for a screen and Mother refused permission for an oral swab. *See id.* at 34. On the date of the first hearing in June 2024, Mother tested positive for amphetamine, methamphetamine and buprenorphine. *See id.* at 35. On the second day of the hearing, in July 2024, Mother was unable to supply a urine sample, and she refused to provide an oral swab. *See* N.T. Hearing, 7/18/24, at 5. There were times when screeners went to Mother's home to test Mother, and Father was present even if Mother was not home, despite Mother reporting they were not an intact couple. *See* N.T. Hearing, 6/20/24, at 38.

Foster Father testified he and his wife are Child's maternal uncle and aunt, respectively, and have been child's Foster Parents since she was placed in their home on June 24, 2022. Foster Father explained Child did not exhibit any issues separating from Mother after supervised visits and that Child no longer stated she wanted to stay with Mother. *See id.* at 48, 49. Foster Father testified that, when Child first came to their home, she was socially awkward and delayed in her speech and motor skills. *See id.* at 49-52. As a result, Child attends therapy to address these needs, but Mother neither attended any of Child's therapy appointments nor sought information about them, despite Foster Father consistently providing Mother information about them occurring. *See id.* at 53-54. Because Child was not enrolled in school until being placed in foster care, Child began attending kindergarten at 7 years of age. *See id.* at 54. Child is smart and progressing in school now, and Foster Parents help with her educational needs.

Tiffany Mazary of The Children's Institute witnessed the supervised visits between Mother and Child, which began in March 2022. She stated she had no concerns about Mother's visits and that they could have moved to unsupervised if Mother complied with The Children's Institute's recommendation that she attend a drug and alcohol evaluation and follow all recommendations, as well as maintain independence from Father, but she failed to do so. *See* N.T. Hearing, 7/18/24, at 6, 11, 23. According to Mazary, Child had no issues when leaving visits with Mother. *See id.* at 17.

WCCB caseworker Tara Lorenzo testified the reason Child was placed in WCCB custody was Child's lack of educational enrollment, her isolation, Parents' substance abuse, and Father's indicated status of perpetrating sexual abuse of a minor. *See id.* at 26. Lorenzo reported that Mother did not participate in Child's most recent family service plan, put in place to address concerns about housing, substance abuse, Child's developmental and educational well-being, and concerns about Father's indicated status. *See id.* at 28. Mother would not acknowledge Father as an indicated sexual abuse perpetrator, never completed any drug and alcohol treatment, refused to sign required releases of information, failed to consistently comply with random drug screens, and tested positive for illicit substances on nineteen occasions. *See id.* at 28-31. Lorenzo detailed that the WCCB created a plan for Mother such that if Mother would submit to random drug screens consistently 3 times per week, and test negative except for prescribed suboxone, Mother's visits could move to unsupervised. The WCCB did provide Mother unsupervised visits with Child beginning December 2022. Mother even stated at a Permanency Review Hearing that she would test five days per week, but as of May 4, 2023, Mother only had submitted to 3 drug screens and refused all other attempts, so visitation returned to supervised as a result of her failure to provide proof of sobriety. *See id.* at 33-34. Mother was unsuccessfully discharged from community resources, non-offender's treatment and grief counseling in February 2023 due to non-compliance. *See id.* at 38, 39.

Lorenzo explained Father was often at Mother's home, even when Mother was not present. Father was present for video calls between Mother and Child, and, in fact, formal service of the termination petition was made on Father at Mother's house. *See id.* at 46,47. Lorenzo testified Mother never moved beyond moderate progress in alleviating the circumstances that led to Child's removal. *See id.* at 49, 50. Lorenzo stated that Child separated easily from Mother after visits and that Child had integrated well into Foster Family. *See id.* at 37. Lorenzo believed it was in Child's best interest to be adopted by Foster Family, which was an adoptive resource.

Finally, Dr. O'Malley testified about Child's play therapy. *See id.* at 75. Child told Dr. O'Malley that she felt safe in Foster Family's home and unsafe and uncared for in her Mother's home. *See id.* at 81. Child reported she witnessed fights between her Parents and that bad things happened in their home. *See id.* at 83. Child depicted Foster Family as her family in drawings. *See id.* at 85.

Mother presented no evidence or testimony.

After taking the matter under advisement, on August 2, 2024, the orphans' court entered an order terminating Mother's parental rights pursuant to 23 Pa. C.S.A. § 2511(a)(2), (a)(8) and (b). Mother timely appealed and filed a contemporaneous statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2).

Mother presents the following issues for our review:

J-S06003-25

I. Whether the honorable [orphans'] court erred in finding by clear and convincing evidence that [the WCCB] has met its burden as to terminating parental rights of Mother pursuant to 23 Pa.C.S.[A. §] 2511(a)(2) and 23 Pa.C.S.[A. §] 2511(a)(8)[.]

II. Whether the honorable [orphans'] court erred in finding by clear and convincing evidence that [the WCCB] has met its burden under 23 Pa.C.S.[A. §] 2511(b) that the best interests of [] Child are met by terminating Mother's parental rights[.]

Appellant's Brief, at 4.

Our standard of review in cases of the involuntary termination of parental rights is well-settled:

[A]ppellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and

- 11 -

convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (quotation marks and citations omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under one of the eleven enumerated grounds set forth at Section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which focuses upon the child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must satisfy both Section 2511(a) and (b) by clear and convincing evidence. *See In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see also Interest of M.E.*, 283 A.3d at 830.

In the instant case, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (a)(8), and (b). To affirm the order, however, we need only agree with the court's decision as to any one subsection of Section 2511(a), along with Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). As such, we will focus our discussion on Section 2511(a)(2) and (b), which provide as follows:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

...

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

...

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of subsection (a)(2), the party petitioning for termination must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot and will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). "The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are

not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.P.D.*, 324 A.3d 11, 26 (Pa. Super. 2024) (citation omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* (citation omitted).

Mother argues that she has not demonstrated an incapacity or refusal to parent because the visitation supervisors did not note any parenting deficiencies or concerns,. *See* Appellant's Brief, at 14. We disagree.

The orphans' court explained:

[As evidenced by] the abundance of evidence produced by the WCCB, the issues that caused the Child to be placed remain unaddressed to this day. Mother has never actively engaged in drug and alcohol treatment or screens to demonstrate sobriety, nor has she demonstrated that she is willing and able to separate herself and protect the Child from Father as an indicated abuser. … In addition to the fact that several of the witnesses on behalf of the Agency feel that Mother has not remedied the circumstances creating a lack of parental care and control during this case, it is also noteworthy that services have been offered to Mother since January 2022.

Orphans' Court Opinion, 10/23/24, at 5.

The record supports the orphans' court's findings. Mother never obtained a compliance level higher than moderate over the life of this case. Mother failed to actively participate in services required for reunification, despite have been provided with them for approximately 28 months. Out of 206 drug screening attempts, only 25 were successful, with Mother testing positive 19 times out of those 25. This is despite Lorenzo having explained to

Mother that visitation with Child could be unsupervised if Mother completed 3 negative drug screens per week. Although Mother claimed she was attending drug and alcohol treatment, she failed to provide any proof of same. Mother did not participate in Child's most recent family services plan and failed to attend or reschedule a bonding assessment with Dr. Rosenblum. Mother chose not to participate in Child's educational needs, attend any medical appointments, or even ask about them. Importantly, Mother denied Father's potential danger to Child, although Father had an indicated report of sexual abuse involving another child. Based on the foregoing, the evidence was sufficient to support termination pursuant to 23 Pa.C.S.A. § 2511(a)(2).

Having found sufficient evidence to support termination pursuant to 23 Pa.C.S.A. § 2511(a)(2), we next consider whether the record supports the orphans' court's finding that termination was appropriate pursuant to 23 Pa.C.S.A. § 2511(b). Mother argues 23 Pa.C.S.A. § 2511(b) was not satisfied because the WCCB failed to provide clear and convincing evidence that termination would best serve Child's needs and welfare because the only evidence presented going to Section 2511(b) was Dr. Rosenblum's testimony and she missed the bonding evaluation through no fault of her own. *See* Appellant's Brief, at 14-15. We disagree.

Section 2511(b) affords "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Our Supreme Court has explained:

- 15 -

[C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the child[is] in a pre-adoptive home and whether [she] ha[s] a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

**K.T.**, 296 A.3d at 1105-06 (citations and quotations marks omitted).

Specifically, the child's bond with the parent, "plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." **Id.** at 1109. While our Supreme Court has directed that a Section 2511(b) inquiry must include consideration for the bond between the parent and the child, the Court has explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." **Id.**

Thus, the extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." **J.M.**, 991 A.2d at 324 (citation omitted).

- 16 -

It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." **M.E.**, 283 A.3d at 839 (citation omitted). This Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents[.]" **Id.** (citation omitted). We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. **See id.**

The orphans' court observed:

During the trial, the WCCB presented the testimony of Dr. Neil Rosenblum, a psychologist who performed both an individual evaluation on the Child and an interactional evaluation between the Child and her maternal uncle and aunt[, current foster parents and an adoptive resource]. Dr. Rosenblum had scheduled for Mother and Father to also participate in interactional evaluations, but neither parent elected to participate.

Based upon the information obtained during the interactional evaluation with the maternal aunt and uncle, Dr. Rosenblum found that the foster parents are providing the support to the Child needed to catch up her development in terms of her education, her socialization, her speech and language skills her fine motor skills. Based upon the information available to Dr. Rosenblum, he found that the Child has essentially moved on from the relationship she shared with Mother and has formed a secure attachment to the maternal aunt and uncle. Removing the Child from her current placement would be traumatic and likely lead to regression in her development.

Lastly, evidence has also been presented to show that the Agency is not seeking termination of Mother's rights due to any environmental factors that are beyond her control. The Agency provided referrals and resources to Mother for at least two years to address these issues. Mother had ample opportunity over the lengthy history of this case to address these issues and reunify with the Child.

Orphans' Court Opinion, 10/23/24, at 6. We discern no abuse of discretion.

Dr. Rosenblum provided ample testimony in support of his finding that the bond between Child and her Foster Father and maternal aunt is secure and that it is in Child's best interest that she remain with Foster Family. He stressed the importance of permanency and security for Child. While Mother now complains that Dr. Rosenblum made these findings without having conducted a bonding analysis between her and Child, this is a situation that was not due to circumstances out of her control, but of her own making. While she did not attend the scheduled evaluation due to illness, *see* Appellant's Brief, at 14-15, the fact remains that Mother failed to return phone calls from Dr. Rosenblum's office seeking to reschedule the appointment, and she never reached out to do so on her own. Child cannot remain in limbo indefinitely, waiting for Mother's potential, future compliance.

Mother did not comply with drug related requirements, avail herself of over 2 years' worth of proffered services for reunification, and denied the threat of harm created by Father's presence. On the other hand, Child has the opportunity to continue living in a loving, stable environment with Foster Parents, her aunt and uncle, with whom she has a strong, stable, loving bond. The trial court properly found it is in Child's best interest that Mother's parental rights be involuntarily terminated.

We affirm the August 2, 2024 order terminating Mother's parental rights to Child.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  3/13/2025