J-S46032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: R.J.-K.G.-G., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.C.G., MOTHER | : : : : : : : | |
| | : | No. 1024 WDA 2025 |

Appeal from the Decree Entered July 22, 2025
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
2025-A0055

BEFORE:  BOWES, J., NICHOLS, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED: January 23, 2026**

Appellant, A.C.G. ("Mother"), appeals from the decree entered in the Erie County Court of Common Pleas, granting the petition of Appellee, the Erie County Office of Children and Youth ("OCY"), for involuntary termination of Mother's parental rights to her minor child, R.J.-K.G.-G. ("Child").  We affirm.

The trial court opinion set forth relevant facts of this appeal as follows:

> Child was born [in October] 2024.  Child was removed by verbal request of OCY and subsequent Order for Verbal Authorization (Emergency Protective Custody) on October 11, 2024.  Mother tested positive for benzodiazepines on a drug urine screen at the Child's birth, and additionally had been admitted to Saint Vincent Hospital for an overdose and tested positive for benzodiazepines, cocaine, and opiates and refused referrals for services on August 22, 2024.  Mother further was uncooperative in providing the agency her prescriptions and home address on October 10, 2024, preventing the agency from assuring the safety of the home.  On October 10, 2024, the agency received a referral for Mother regarding concerns for parental behavior, health concerns, inadequate housing, and substance use by a

parent. Child was adjudicated dependent on October 24, 2024. Mother's Proposed Treatment Plan was as follows:

1. Submit to genetic testing to assist in establishing paternity.

2. Complete a mental health assessment and follow any and all recommendations made. Additionally, Mother shall demonstrate mental health stability.

3. Complete a drug and alcohol assessment through Erie County Drug and Alcohol and follow any and all recommendations made. Additionally, Mother shall be open and honest in her assessment and demonstrate skills learned.

4. Refrain from the use of drugs and/or alcohol and submit to random drug and alcohol testing through an agency approved location.

5. Maintain safe and stable housing with proof of residency. Additionally, Mother shall maintain working utilities and appropriate living conditions.

6. Participate in an agency approved parenting program and demonstrate skills learned.

7. Meet with the agency caseworker and sign all pertinent releases of information requested.

(Trial Court Opinion, filed 9/11/25, at 1-2) (internal record citations and quotation marks omitted). Upon his removal from Mother's care, OCY placed Child with his maternal aunt. Child has remained in this placement ever since.

At the subsequent permanency review hearings, OCY established that Mother had made minimal progress towards compliance with her treatment plan. On May 22, 2025, OCY filed a petition for the involuntary termination

of Mother's parental rights to Child.[1]  The court conducted a termination hearing on July 18, 2025.  At that time, the court received testimony from an OCY supervisor, the OCY caseworker, and an expert in clinical psychology.  Mother also testified on her own behalf.  On July 22, 2025, the court entered a decree terminating Mother's parental rights to Child, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b).  Mother timely filed a notice of appeal and concise statement of errors on August 12, 2025.

Mother now raises four issues for this Court's review:

> Whether the trial court erred in finding, under [Section] 2511(a)(1), that Mother evidenced a settled purpose to relinquish parental claim or failed to perform parental duties.
>
> Whether the trial court erred under [Section] 2511(a)(2) by determining that any incapacity could not or would not be remedied.
>
> Whether the court erred under [Section] 2511(a)(5) in concluding that the conditions leading to removal continued to exist despite Mother's partial compliance and progress.
>
> Whether the court erred under [Section] 2511(b) in finding termination was in the child's best interests without adequately considering the parent-child bond or potential detriment.

(Mother's Brief at 7).

Appellate review in termination of parental rights cases implicates the

---

[1] The petition also sought to terminate the parental rights of J.D.G. ("Father"). By decree filed on July 18, 2025, the court terminated Father's parental rights. Father is not a party to the current appeal.

following principles:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 667 Pa. 268, 294-95, 255 A.3d 343, 358-59 (2021)

(internal citations and quotation marks omitted).

OCY filed a petition for the involuntary termination of Mother's parental rights on the following grounds:

### § 2511. Grounds for involuntary termination

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b)   Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).   "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions."  *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010).[2]

Regarding the evidence to support involuntary termination under Section 2511(a)(2), Mother contends that OCY's witnesses "relied heavily on historical information rather than current evidence of incapacity."  (Mother's Brief at 14).  Mother emphasizes the caseworker's testimony "that she met

---

[2] OCY also sought the involuntary termination of Mother's parental rights under Section 2511(a)(1) and (5), but we need only analyze Section 2511(a)(2) for purposes of this appeal.

Mother only three times between February and July 2025, providing minimal firsthand observation of Mother's current functioning." (*Id.*) Mother relies on her own testimony for the proposition that "she was actively working to remedy the conditions that led to removal." (*Id.* at 15). Mother insists that "[s]he was cooperative with caseworkers, maintained communication with OCY, completed a drug and alcohol assessment that required no treatment, obtained a parenting certificate, and maintained appropriate housing." (*Id.*) Mother argues that her "actions evidence progress, stability, and an ongoing willingness to assume parental responsibilities." (*Id.*) Mother concludes that the court erred by terminating her parental rights under Section 2511(a)(2). We disagree.

"The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.P.D.*, 324 A.3d 11, 26 (Pa.Super. 2024).

> Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. Under Section 2511(a)(2), the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*Id.* (internal citations and quotation marks omitted).

- 6 -

"Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." ***In re Z.P., supra*** at 1117 (quoting ***In re E.A.P.***, 944 A.2d 79, 82 (Pa.Super. 2008)).

> Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. **This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.**
>
> Thus, while sincere efforts to perform parental duties, can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). … A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.
>
> Moreover, a court may terminate parental rights under subsection (a)(2), even where the parent has never had physical custody of the child.

***Id.*** at 1117-18 (internal citations and quotation marks omitted) (emphasis in original).

Instantly, the court received testimony from Stacie Pedersen, an OCY supervisor who worked with Mother after her three older children were adjudicated dependent. OCY began its involvement with Mother in 2018. Ms. Pedersen explained that OCY has always been concerned with domestic violence in Mother's home, as well as Mother's drug use. Mother has also

faced sporadic periods of incarceration, and "[s]he had been uncooperative with agency services." (N.T. Hearing, 7/18/25, at 10). After providing the historical context for Mother's contacts with OCY, Ms. Pedersen testified that Mother continues to be plagued by "the same issues of substance abuse, domestic violence, housing concerns and [Mother] not admitting or recognizing that she has a substance abuse issue." (*Id.* at 14-15).

Ms. Pedersen also explained the circumstances surrounding Child's removal from Mother's care:

> There were concerns about parental substance abuse. [Mother] had delivered [Child], and they had tested positive for benzodiazepines, and she had also been admitted to the hospital in August of 2024 due to an overdose, and at that point she had tested positive for benzodiazepines, cocaine and opiates. And it was noted that she had refused any referrals for services at that time.
>
> There were additional concerns about [Mother's] level of cooperation. She was not cooperative. She would not provide information about her current prescriptions or her physical home address, and that made it impossible for the agency to ensure the safety of the child in her home.

(*Id.* at 15-16).

Next, OCY presented testimony from Traci Glover, Child's case worker. Ms. Glover confirmed that she had in-person meetings with Mother on three occasions. (*See id.* at 27). At the meeting on April 28, 2025, however, Ms. Glover arrived at the family home and found police present. Ms. Glover "went and asked the officer why he was there, and he said that there was some domestic violence" involving Mother and Father. (*Id.* at 28).

Regarding Mother's mental health, Ms. Glover conceded that Mother went to Lake Erie College of Osteopathic Medicine ("LECOM") for an assessment. LECOM referred Mother for intensive case management, but Mother did not follow through on the referral. (*See id.* at 29). Mother also completed a drug and alcohol assessment, but she failed to appear for all court-ordered urine tests. Specifically, Mother did not appear for 63 urine tests. (*See* Hearing Exhibit 8). When she did appear for testing, Mother tested negative on four occasions and positive on two occasions, with one diluted sample.[3] (*Id.*)

Ms. Glover also testified about concerns over Mother's housing. Although Mother's residence "met the requirements of having four square walls," Ms. Glover explained "the concern was that [Father] was in the home and the domestic violence." (*Id.* at 31). Significantly, Mother and Father continued in their abusive relationship during the same month as the termination hearing:

> [COUNSEL:]   What about domestic violence, is that still a concern for you?
>
> [WITNESS:]   Domestic violence is still a concern.
>
> [COUNSEL:]   Even as recently as how long?

---

[3] Mother's noncompliance with the court-ordered drug testing is particularly important because it prevented her from attending visits with Child. As noted in the court's summary of the May 14, 2025 permanency review hearing, "[Mother] has not consistently attended urine screens; therefore, visitation has not occurred on a consistent basis during the review period." (Hearing Exhibit 6).

[WITNESS:] Even as recently as 7/3/2025.

[COUNSEL:] Okay. What was that?

[WITNESS:] [Father] headbutted [Mother].

[COUNSEL:] Okay. And that's after—and this is after everything that's been going on and they're still engaged in this sort of stuff?

[WITNESS:] Yes.

(*Id.* at 33). Ms. Glover added that Mother remained in denial about the severity of these issues.

The court considered this testimony and determined that OCY provided clear and convincing evidence in support of termination:

> Mother's inability to correct her substance abuse issues, mental health concerns, and continuing cycle of domestic violence with Father have caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being…. Mother's substance abuse problems alone have caused this lack of essential care for the child, as he was born drug-exposed [in October] 2024. This, combined with Mother's August 22, 2024 overdose while pregnant with child, evidences the repeated and continuing nature of Mother's substance abuse issues while also directly contradicting her testimony at trial.[4]
>
> The child was adjudicated dependent on October 22, 2024. Between this adjudication, and the agency's filing of the Petition on May 22, 2025, Mother had over seven (7) months to address the agency's concerns for her substance abuse, mental health, or domestic violence occurrences. Mother did not address any of these issues in a substantial way, with the vast majority of her urinalysis results being

---

4 Mother testified that drug and alcohol abuse is not currently a problem for her. (*See* N.T. Hearing at 96-97).

no-shows, which were positive by default, and registering positive results in March for Benzodiazepine, Alprazolam, and Hydroxyalprazolam. Given Mother's lack of performance regarding her treatment plan, it is clear that the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother under her current circumstances.

(Trial Court Opinion at 23) (internal citations and quotation marks omitted). Our review of the record supports the court's conclusions. Thus, the court did not err in determining that Mother's incapacity caused Child to be without essential parental care, and the causes of the incapacity cannot or will not be remedied. *See Adoption of C.P.D., supra*.

In her final issue, Mother claims that "the trial court failed to make any explicit findings regarding the existence or quality of the bond between Mother and the child." (Mother's Brief at 16). Mother complains that "[n]o bonding evaluation was conducted, and the record is devoid of any credible evidence that termination would serve the child's long-term welfare." (*Id.* at 16-17). Mother maintains that the court compounded this error by failing to "evaluate the nature of the child's attachment to Mother, the impact of terminating that bond, or the potential for continued contact to promote stability and emotional security." (*Id.* at 17). Mother concludes that the court erred by terminating her parental rights under Section 2511(b). We disagree.

If the court determines that there are grounds to terminate parental rights under Section 2511(a), the court must "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and

welfare of the child under the standard of best interests of the child." *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child." *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P., supra* at 1121.

Additionally:

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care…; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability. These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs. Trial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs.

*Interest of K.T.*, ___ Pa. ___, ___, 296 A.3d 1085, 1113 (2023) (internal citations and footnotes omitted).

Contrary to Mother's assertions, the record contains credible evidence regarding Child's physical and emotional needs and welfare. Initially, Ms. Glover opined that the involuntary termination of Mother's parental rights

would serve Child's best interests. (*See* N.T. Hearing at 36). Ms. Glover elaborated:

> I just think [Child] is in a good place right now. I mean, he's been with his aunt for a while. He's going to baseball games. He's in a home where there are several caregivers. He's going swimming. He's sitting up. He's thriving. So I think where he is right now is in a good place.

(*Id.* at 37).

The court also received testimony from Dr. Peter von Korff, a licensed clinical psychologist who provides assessment services for OCY. The parties stipulated to Dr. von Korff's status as an expert in his field. (*See id.* at 64). Dr. von Korff testified that he interviewed Mother in 2018 and 2019, in conjunction with the dependency proceedings for Mother's other children. After discussing the findings from the interviews, Dr. von Korff indicated that "this morning's testimony has been very consistent with the individual that I met back in [20]18 and [20]19." (*Id.* at 69).

Dr. von Korff also addressed the impact of Mother's minimal visitation with Child. The trial court found this testimony noteworthy, and it summarized Dr. von Korff's assessment as follows:

> Dr. von Korff was asked about infant and parent attachment, and what importance the "early years for a parent and child" are for bonding. Dr. von Korff briefly discussed how an "infant bonds with the individuals who are providing everyday care, safety and security, who are providing comforting when needed, who are resolving problems for the child on a daily basis." Dr. von Korff described the possibility of "taking a nine-month-old away from someone they're bonded with to somebody that's essentially a stranger" as "disrupted attachment." Dr. von

Korff stated that when "children at various ages get diagnosed with various psychiatric diagnoses, attention deficit or reactive attachment or … mood disorder or oppositional defiant disorder," a root cause and "origin of these difficulties is really having to do with disrupted attachment." Agency counsel asked if the child would experience "negative effects … should the mother's or father's rights in this particular case be involuntarily terminated." Dr. von Korff stated "the essential thing is that the child is maintaining contact with the people who are providing daily care and support," and that a "nine-month-old child does not feel a sense of loss when a biological parent exits their life as a result of a proceeding like this."

(Trial Court Opinion at 14-15) (internal citations omitted).

On this record, the court determined that the involuntary termination of Mother's parental rights served Child's best interests:

The child has been in the care of maternal aunt [G.G.] since nearly the inception of the dependency case. The agency has reported that the maternal aunt has received sufficient instruction to care for the child, and Ms. Glover testified to all the child's needs being met while in maternal aunt's custody. Given Mother's issues and her denial of how they impede her ability to care for the Child, it is clear that the developmental, physical and emotional needs and welfare of the child are best served by involuntarily terminating Mother's parental rights.

(*Id.* at 24-25) (internal quotation marks omitted). Here, the court correctly concluded that terminating Mother's parental rights would not destroy an existing, necessary, and beneficial relationship for Child. *See In re Z.P., supra*. Based upon the foregoing, we cannot say that the court erred in terminating Mother's parental rights, and we affirm the decree for involuntary termination of Mother's parental rights. *See Adoption of C.M., supra*.

Decree affirmed.

- 14 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: <u>1/23/2026</u>