J-S46004-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: H.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 983 WDA 2025 |

Appeal from the Order Entered July 22, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000089-2024


BEFORE:  BOWES, J., NICHOLS, J., and KING, J.

MEMORANDUM BY BOWES, J.:                    **FILED: February 10, 2026**

H.B. ("Mother") appeals from the order terminating her parental rights as to her son J.B., born in January 2023.[1]  We affirm.

We glean the following history from the record.  Mother prematurely gave birth to J.B. while she was hospitalized in a psychiatric unit.  Within a matter of days, Allegheny County Office of Children, Youth and Families ("CYF") was granted emergency protective custody of J.B.  At the ensuing shelter care hearing, Mother exhibited significant drug, alcohol, and mental health concerns, and she explained that she would be homeless upon release from her inpatient stay.  J.B. remained in the NICU for an extended period and was adjudicated dependent in February of 2023.  Mother's court-ordered

---

[1] Mother identified C.P. ("Father") as J.B.'s father.  The court granted CYF's petitions to terminate the parental rights of both Father and any unknown father.  Notably, Father withdrew his contest to the termination petition and did not appeal the court's order.

goals required her to: (1) continue with her mental health treatment and follow all recommendations; (2) participate in a drug and alcohol evaluation and undergo any recommended counseling; (3) comply with random urine screens; (4) attend supervised visits with J.B.; and (5) obtain housing. **See** N.T., 3/21/25, at 105.

Thereafter, Mother secured appropriate housing and consistently visited J.B. However, she only sporadically engaged with the other services and did not fulfill her remaining goals. Specifically, as will be discussed at length below, she did not address her mental health. Additionally, Mother's behavior became concerning to CYF as she began to follow CYF supervisors to their vehicles after visits at her residence and attempted to inhibit their egress. Ultimately, following Mother's apparent admission to an in-patient treatment facility in October 2023, CYF was permitted to move visits from Mother's residence to the CYF office. Her alarming behavior towards CYF supervisors nonetheless continued. On December 21, 2023, Mother placed unidentified eye drops into J.B.'s eye during a supervised visit at the CYF office, causing chemical conjunctivitis. Upon CYF's motion, the court suspended visitation, and Mother has had no contact with J.B. since that visit.

On September 23, 2024, CYF filed a petition to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8). The court

held two termination hearings, with Mother represented by counsel.[2]  The first hearing occurred on March 21, 2025, at which the court heard testimony from, *inter alia*, Patricia Pepe, Ph.D., and CYF caseworkers Rhianna Diana and Ciera James.  Relevantly, Mother attended approximately thirteen of her thirty-nine scheduled drug screens between February 19, 2023, and March 21, 2025, and tested positive for Adderall on September 3 and October 30 of 2024, as well as for THC on the October screen.

Dr. Pepe testified as an expert in child psychology and forensic psychology.  She conducted a psychological evaluation of Mother on January 25, 2024, at which time Mother exhibited signs of psychosis, rendering it difficult to complete the assessment.  Nonetheless, Dr. Pepe diagnosed Mother with schizophrenia.  Although Mother has intermittently sought treatment, she refuses to acknowledge a schizophrenia diagnosis and consequently will neither seek counseling nor take medication for that disorder.  Instead, she has maintained that she suffers from ADHD and is prescribed Adderall.

Dr. Pepe unsuccessfully attempted to conduct an updated evaluation of Mother on January 15, 2025.  However, she was able to perform an interactional evaluation with J.B. and his then-current foster family.  She opined that Mother and J.B. did not have a bond in light of J.B.'s age and the

_____

[2] J.B. was represented by Lexus Cersosimo, Esquire, from KidsVoice, as guardian *ad litem* and legal counsel.  The orphans' court found no conflict in Attorney Cersosimo representing both his legal and best interests given his age and inability to articulate a preference.  Although not part of this appeal, we note that this matter was consolidated with a goal change request on the dependency docket.

length of time he had been without contact from Mother. Dr. Pepe explained that the prospect of J.B. being moved to a new foster family would not affect her concerns about Mother's ability to parent J.B.

At the conclusion of the hearing, the court turned to the dependency portion of the hearing and considered CYF's motion to change J.B.'s foster placement. Although J.B. had been with the same family for approximately one year and achieved success there, they were no longer willing to serve as foster parents because they felt threatened by Mother's repeated text messages to return her son, especially in light of the fact that she was not supposed to have had access to their identities or contact information. Attorney Cersosimo concurred with the requested change and asked that any new placement details be kept confidential from Mother. The court granted CYF's request to change J.B.'s placement, directed that the identities and location of the new family remain private, and warned Mother not to seek them out. J.B. has been in that pre-adoptive foster home since April 8, 2025.

The second termination hearing was postponed to July 10, 2025, because Mother had again been involuntarily hospitalized. At the hearing, the court received testimony from Mother's therapist at Pittsburgh Mercy Behavioral Health ("Mercy"), Katie Halloran; CYF supervisor Wendy Dunbar-Kraus regarding recent updates; and Mother.

Mother testified that she has ADHD and anxiety, and that she has begun consistent treatment at Mercy, having completed intensive outpatient therapy earlier in 2025 and begun individual therapy in February of 2025. Mother

explained that she takes her prescribed medications when she deems it necessary but finds more benefit from attending church, engaging in individual therapy, and absorbing Vitamin D from the sun. However, she also admitted to purposefully abusing an unknown drug, likely Adderall, in April. *See* N.T., 7/10/25, at 74.

Having failed to address her true diagnoses, Mother has unsurprisingly been involuntarily committed four times since J.B.'s birth for episodes of acute psychosis, the most recent occurring in April 2025 while she was engaged in the aforementioned intensive outpatient program. CYF voiced concerns with Mother's inability to address her mental health, noting "that, throughout the life of the case, [M]other has jumped around from treatment to treatment to treatment, not focusing on what the professionals have been recommending . . . for her to focus on; medication management, the appropriate treatment." N.T., 3/21/25, at 135. Simply put: "Her current telehealth individual sessions are not addressing the . . . diagnosis which led to her crisis and hospitalization." N.T., 7/10/25, at 30-31.

CYF relayed that J.B.'s current foster parents take care of all his needs, ensure that he attends medical appointments, and have assisted him in being successfully discharged from physical therapy and to soon graduate from occupational therapy. "He looks to them for love and affection, goes to them when he needs help." *Id*. at 32. CYF opined: "Given that he has been in care most of or his entire life and [M]other hasn't been able to maintain a period of consistent mental health stability, [F]ather's not engaged, the

agency does believe that the best interest would be adoption." *Id*. at 32. Attorney Cersosimo also asked the court to grant the termination petitions as in J.B.'s best and legal interests. *Id*. at 98.

The court took the matter under advisement. On July 11, 2025, it terminated Mother's parental rights pursuant to § 2511(a)(2), (a)(8), and (b).[3] This timely appeal followed. Both Mother and the orphans' court complied with the requirements of Pa.R.A.P. 1925. In this Court, Mother raises the following issues for our consideration:

I.   Did the [orphans'] court err in granting the petition for the involuntary termination of parental rights under 23 Pa.C.S. § 2511(a)(2) when there was not clear and convincing evidence that Mother's chosen holistic treatment options for her mental health needs would cause the child to go without proper care and treatment?

II.  Did the [orphans'] court err in granting the petition for involuntary termination of parental rights under 23 Pa.C.S. § 2511(a)(8) when the [orphans'] court's failure to restore Mother's visits was also a reason for granting the petition?

III. Did the [orphans'] court err in finding that the child's needs and welfare were better served by a placement he had only just met?

Mother's brief at 6.

On appeals from termination petitions, this Court must accept the orphans' court's findings of fact and credibility determinations so long as they have record support. *See In re E.J.C.*, 335 A.3d 1222, 1229 (Pa.Super.

_____

[3] Attorney Cersosimo continues to argue on appeal that termination serves J.B.'s best interests. *See* J.B.'s brief at 28-30.

2025).  If they are so supported, we are then tasked with determining whether the "court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result."  *Id*. (cleaned up).  We grant such deference to the orphans' court because it "often ha[s] first-hand observations of the parties spanning multiple hearings."  *Id*. (cleaned up).

Involuntary termination is governed by 23 Pa.C.S. § 2511, which sets forth a bifurcated framework.  First, the orphans' court must assess whether the agency has established, by clear and convincing evidence, that termination is warranted pursuant to one of the grounds outlined in § 2511(a).  *Id*. at 1230.  Only then does the court proceed to § 2511(b), "which focuses upon the child's developmental, physical, and emotional needs and welfare."  *Id*. (cleaned up).  This Court need only agree with the orphans' court's conclusions as to one subsection of § 2511(a), as well as § 2511(b), to affirm.  *Id*.  Presently, we focus upon § 2511(a)(2) and (b).  Those provisions state as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without

essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  . . .

23 Pa.C.S. § 2511.

We have expanded upon the requirements for termination pursuant to § 2511(a)(2) as follows:

The grounds for termination of parental rights under [§] 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary[,] those grounds may include acts of refusal as well as incapacity to perform parental duties.  Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities.  Under [§] 2511(a)(2), the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of C.P.D.***, 324 A.3d 11, 26 (Pa.Super. 2024) (cleaned up).

Mother argues that her testimony at the termination hearing proved she was addressing her mental health issues by completing an intensive outpatient program, attending weekly individual therapy sessions, receiving support from her church, and replacing her medication, which had unwanted side effects,

with a more holistic approach, including natural intake of Vitamin D. *See* Mother's brief at 11-12. She emphasizes that she had consistently treated with Mercy for therapy throughout 2025, which demonstrated substantial progress on addressing CYF's mental health concerns. *Id*. at 12-13. Finally, Mother highlights her stable employment and housing throughout J.B.'s dependency. *Id*. at 12.

The orphans' court, however, found that Mother had not remedied the mental health issues that had caused J.B. to be without care, explaining its reasoning thusly:

> At the time [J.B.] became active with CYF, Mother's mental health instability constituted the main reason for [J.B.]'s removal from her care and subsequent dependency adjudication. Since that time, the evidence demonstrated that Mother's mental health condition, specifically the repeated diagnoses of schizophrenia and related disorders, is chronic, longstanding, and includes repeated episodes of psychosis. Further, Mother has demonstrated a persistent refusal to accept the diagnoses that cause her condition, and similarly, refuses to accept the recommended treatment, which would be anti-psychotic medication. The record supports the court's observation that when Mother has taken the prescribed anti-psychotic medication she improves, and when she stops, the improvement does not last. Dr. Pepe testified that a parent who has schizophrenia can be a successful parent, but, in order to do so the parent must accept the diagnosis and adhere to treatment recommendations. Mother has done neither. Based on these facts, clear and convincing evidence exists that Mother's mental health diagnosis and failure to adhere to treatment leaves her unable to care for Child. Further, given Mother's history and her recent decision to discontinue all medication, it is reasonable for the court to conclude that her incapacity cannot or will not be remedied.

Orphans' Court Opinion, 9/10/25, at 4-5 (cleaned up).

The court's findings are amply supported by the record. While Mother's recent progress in keeping a consistent mental healthcare provider is commendable, it cannot overcome the fact that she has refused to comply with her medication regimen or engaged in voluntary treatment for the diagnosis that most impacts her ability to parent, *i.e.*, schizophrenia. Unfortunately, this has resulted in repeated inpatient admissions for acute episodes of psychosis, notwithstanding her engagement in other therapy at Mercy. Hence, we find no error in the court's conclusion that Mother cannot or will not remedy the mental health issues that have caused approximately three three-year-old J.B. to be without parental care since his birth.

Having found statutory support for termination, we now assess § 2511(b), which requires the orphans' court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). We note that "the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," with an eye towards "each child's specific needs." *Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

This inquiry must factor in the bond between the parent and the child. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has explained, however, that "only a necessary and beneficial" parental bond should be maintained. *Interest of K.T.*, 296 A.3d at 1009. A bond is considered necessary and beneficial if its severance would cause extreme emotional consequences or significant, irreparable harm. *Id*. at 1009-10. The

- 10 -

extent, however, of the "bond-effect analysis necessarily depends on the circumstances of the particular case." ***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa.Super. 2010) (cleaned up). It is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents[.]" ***Interest of M.E.***, 283 A.3d 820, 839 (Pa.Super. 2022) (citations omitted). Courts should also consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***Interest of K.T.***, 296 A.3d at 1106 (cleaned up). Finally, we note that a child's "emotional needs and welfare include intangibles, such as love, comfort, security, and stability." ***Id***. (cleaned up).

Mother contends that the court erred in finding that termination best served J.B.'s needs and welfare because although the lack of visits for an extended period of time had resulted in no bond between Mother and J.B., "there was similarly no bond between any other caregiver." Mother's brief at 17. Rather, she avers that there is an inherent "beneficial relationship" that exists between a child and his natural parent, and therefore termination was improper. ***Id***.

As noted by the orphans' court, any underdeveloped relationship J.B. may have with his pre-adoptive foster parents at the time of the July termination hearing was because he had to be relocated to that family "after the first day of the termination hearing" due to Mother "sending threatening text messages to [the prior] foster parents, whose identity was to be confidential[.]" Orphans' Court Opinion, 9/10/25, at 6 n.15. More

- 11 -

importantly, the court found that because no bond existed between J.B. and Mother, terminating her parental rights would not cause him "severe emotional consequences. Instead, [he] is in a positive placement with his new pre[-]adoptive foster parents with whom he had spent time before being placed in their care." *Id*. at 7 (footnote omitted). The court observed that the foster parents were meeting his needs, he had adjusted well to the relocation, and "ha[d] made progress with the specialized services he has received while in their care." *Id*. The court concluded that J.B.'s "placement with foster parents clearly serves [his] needs and welfare and he deserves the permanency that termination of Mother's parental rights will provide." *Id*. at 7-8.

Upon review, we find record support for the court's findings and discern no abuse of discretion in the court's analysis. J.B. has thrived in his prior placements, and has continued to do so with his present pre-adoptive foster parents. Contrarily, J.B. has never been in Mother's care during the entire nearly three years of his life at this point, and has not had any contact with Mother since December 21, 2023. Plainly, no bond exists between Mother and J.B. Thus, the orphans' court did not err in concluding that terminating Mother's parental rights so that J.B. could finally achieve permanency would best serve his "developmental, physical and emotional needs and welfare[.]" 23 Pa.C.S. § 2511(b).

Accordingly, we affirm the order terminating Mother's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 02/10/2026